[No. 34471-8-II.   Division Two.   April 29, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD MAURICE JONES, JR., *Appellant*.

286

*Patricia A. Pethick*, for appellant.

*George O. Darkenwald* (of *South Puget Sound Community College*) and *Edward G. Holm, Prosecuting Attorney*, for respondent.

¶1 QUINN-BRINTNALL, J. — Based on a confidential informant's (CI) tip, the Thurston County Narcotics Task Force set up a controlled buy targeting Richard Jones, Jr. Jones approached the CI, who was waiting in his car, and gave him a small bag of cocaine in exchange for money. The CI then met the Task Force officers and immediately handed them the small bag of cocaine. Thereafter, the State charged Jones with one count of unlawful delivery of a controlled substance. At trial, neither the CI nor Jones testified. But the State played for the jury a body wire recording and a videotape recording of the drug buy. The State also provided the jury with a transcript of the body wire recording. The jury found Jones guilty as charged. He appeals, arguing (1) prosecutorial misconduct, (2) insufficient evidence, and (3) that the CI was not credible. We hold that the prosecutor's repeated misconduct cumulatively deprived Jones of a fair trial and accordingly reverse and remand for retrial.

## FACTS

¶2 Based on a tip from a CI, the Task Force set up a controlled drug buy targeting Jones. Officer Dale Elliott described the drug buy:

> The plan this day was to give [the CI] $850. We were going to equip him with a body wire or recording device. Then we were going to set him near the barber shop where he was working. And he would make a phone call to Mr. Jones, and the arrangement would be made to purchase the narcotics. He would wait, and Mr. Jones was hopefully going to show up and make a purchase.

Report of Proceedings (RP) (Feb. 21, 2006) at 32.

¶3 Before the drug buy, Officer Elliott thoroughly searched the CI for drugs, finding none. And Officer Adam Seig thoroughly searched the CI's car for drugs, again finding none. The officers equipped the CI with a body wire and then gave him the buy money. From a nearby location, Officer Mike Aalbers recorded the events with a video camera.

¶4 The CI drove his car to the barbershop and parked it in the parking lot. Before Jones arrived, a man approached the CI's car and asked him for a haircut. The CI told the man that he was busy.

¶5 Officers Elliott and Seig observed the CI and the man during this conversation. Despite the unanticipated contact with someone other than Jones, they continued with the scheduled drug buy. Elliott and Seig testified that they continued with the buy because the man who had asked for a haircut did not lean into the CI's car window, exchange anything with the CI, or put anything into the CI's car. Neither Elliott nor Seig searched the CI or the car after the unanticipated contact with the man who had asked for a haircut.

¶6 Thereafter, the CI called Jones and arranged to meet at another location. The CI told Officer Elliott that he was

going to drive about a block to another parking lot. Elliott and Seig followed the CI, both observing that he made no contact with anyone else.

¶7 After the CI parked his car in the parking lot, a car approached him. Jones exited his car and entered the CI's car. Officer Elliott testified, "Both people were bent down in conversation. I could see an exchange. I couldn't see what was exchanged, but I could see an exchange." RP (Feb. 21, 2006) at 45.

¶8 After the exchange, the CI drove his car back to the original parking lot. Again, Officers Elliott and Seig followed him, both observing that he made no contact with anyone else. When the CI exited his car, he immediately handed Elliott a small bag of cocaine.[1] Seig then searched the CI's car for drugs and found none.

PROCEDURE

¶9 The State charged Jones with one count of unlawful delivery of cocaine, a controlled substance. At trial, neither the CI nor Jones testified. Officers Elliott and Seig testified as set out above, and the State played for the jury the body wire recording and the videotape recording of the purported drug buy. The State also provided the jurors with copies of the body wire recording transcript.

¶10 The jury found Jones guilty as charged. By special verdict, the jury found that Jones had unlawfully delivered a controlled substance within 1,000 feet of a school bus route stop. Based on Jones's offender score of five, the trial court sentenced him to 60 months of confinement. Jones appeals.

ANALYSIS

PROSECUTORIAL MISCONDUCT

¶11 Jones asks us to review whether numerous cumulative errors deprived him of his right to a fair trial.

---

[1] The Washington State Patrol Crime Laboratory confirmed that this bag contained cocaine.

Every prosecutor is a quasi-judicial officer of the court, charged with the duty of ensuring that an accused receives a fair trial. *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968), *cert. denied*, 393 U.S. 1096 (1969); *State v. Boehning*, 127 Wn. App. 511, 518, 111 P.3d 899 (2005). We hold that the prosecutor's conduct in this case violated that duty and deprived Jones of his right to a fair trial.

■■ ¶12 In order to establish that he is entitled to a new trial due to prosecutorial misconduct, Jones must show that the prosecutor's conduct was improper and prejudiced his right to a fair trial. *Boehning*, 127 Wn. App. at 518. Prejudice is established where " 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.' " *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996)). But a defendant who fails to object to an improper remark waives the right to assert prosecutorial misconduct unless the remark was so " 'flagrant and ill intentioned' that it causes enduring and resulting prejudice that a curative instruction could not have remedied." *Boehning*, 127 Wn. App. at 518 (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995)).

■■ ¶13 We review a prosecutor's comments during closing argument in the context of the total argument; the issues in the case, the evidence addressed in the argument, and the jury instructions. *Boehning*, 127 Wn. App. at 519. "A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury." *Boehning*, 127 Wn. App. at 519.

¶14 Jones argues that four instances of prosecutorial misconduct occurred during his trial. He contends that the prosecutor (1) played an inadmissible portion of the body wire recording for the jury, (2) improperly bolstered the credibility of the CI and Officer Elliott during closing argument, (3) improperly cross-examined Elliott about why he thought the CI did not testify, and (4) asserted in closing argument that the CI did not testify because he was afraid

of Jones. We hold that playing the inadmissible portion of the body wire recording was an inadvertent error that does not rise to the level of prosecutorial misconduct, but we hold that the three other instances constitute misconduct that cumulatively deprived Jones of a fair trial.

A. Playing Body Wire Recording

¶15 First, Jones argues that the prosecutor committed misconduct when she ignored the trial court's order that portions of the body wire recording could not be played to the jury. Relying on *State v. Stephans*, 47 Wn. App. 600, 604, 736 P.2d 302 (1987), Jones claims that this "[n]oncompliance with court orders constitutes misconduct." Br. of Appellant at 8. We disagree.

¶16 Before trial, the trial court ruled that the State could play an excerpt from the body wire recording to the jury but could not include any reference to future heroin buys contained in the tape.[2] During trial, the State gave jurors copies of the body wire transcript with the excluded evidence redacted[3] and then played an excerpt from the body wire recording to the jury. But the State inadvertently failed to stop the recording before the CI told Jones, "My buddy wants heroin if you can do." Ex. 8, at 8. The State stopped the recording before Jones answered.

¶17 Jones immediately requested a sidebar conference. The trial court heard argument, but it allowed the State to proceed. At the end of the day, the trial court allowed Jones to make a record of the objection he had made during the

---

[2] In part, the trial court ruled that any reference to future heroin buys would be inadmissible under ER 404(b).

[3] It is unclear what document the State handed the jurors. Exhibit 8 is the transcript with the inadmissible portion crossed out, but still readable. The State asked the trial court for a moment to ensure the jurors' copies complied with the trial court's ruling, however, and in argument the State mentioned that it had redacted any reference to future heroin buys in the jurors' copy of the transcript. The jury apparently did not have access to the videotape recording or transcript during its deliberations.

sidebar conference.[4] Jones objected to the excerpt of the body wire recording, arguing, "[T]he jury has heard this recording of at least the [CI] asking my client if he can get heroin. . . . I don't believe -- you've already ruled that inadmissible. At this point I ask for a mistrial." RP (Feb. 21, 2006) at 96-97.

¶18 The State responded that it had made a mistake by not stopping the recording soon enough. The State told the trial court that it could give a limiting instruction to the jury, although "it would kind of highlight that area." RP (Feb. 21, 2006) at 97. Nevertheless, the State noted that the jury did not hear Jones's answer to the CI's request and noted that "it's harmless in this case because it's not on the transcript. You were listening to the transcription as well, Your Honor. You didn't hear it. And we didn't [hear a] response by Mr. Jones." RP (Feb. 21, 2006) at 97.

■ ¶19 The trial court agreed with the State and denied Jones's motion for a mistrial. From our review of the record, it is clear that the State's actions were inadvertent, not in "flagrant disregard" of the trial court's ruling. Moreover, the State's mistake could not have affected the jury's verdict because the State redacted this brief, inadmissible portion from the jurors' copies of the transcript that was admitted as exhibit 8. Thus, Jones has not met his burden of proving prosecutorial misconduct in this instance.

B. BOLSTERING CREDIBILITY

¶20 Jones next argues that the prosecutor improperly bolstered the credibility of the CI and Officer Elliott during closing argument. We agree.

¶21 The prosecutor argued:

[T]his [CI], he's been working with the task force for a long time. He's – this was now his seventh buy-walk. His seventh. Not first, not second, his seventh.

---

[4] But first, the trial court wanted to hear the excerpt from the body wire recording. As the trial court explained, "I didn't hear what counsel was objecting to." RP (Feb. 21, 2006) at 96.

And why did the police still use the same informants? Because they are reliable. Because they can be trusted. Because when they say something happens, it happens. When they are instructed to do something, they do it.

They don't fool around. They don't steal money from the police. They don't take the buy funds and secretly hide them in a compartment only to be distrusted and discovered later on. That doesn't make any sense.

And how much sense does it make to you that Detective Elliott or any narcotics detective would put their own reputation on the line? Their own credibility? Their own integrity of their investigation? Their very livelihood on the line for one silly person who is duping or snookering them somehow?

They are smart individuals. They too are not fools. If they believe for one second, one second that [the CI] wasn't up to par, that he was under the influence or that he couldn't be trusted, do you think they would have continued to use him? I submit to you they would not.

RP (Feb. 22, 2006) at 54.

¶22 Although prosecuting attorneys have some latitude to argue facts and inferences from the evidence, they are not permitted to make prejudicial statements unsupported by the record. *State v. Weber*, 159 Wn.2d 252, 276, 149 P.3d 646 (2006), *cert. denied*, 127 S. Ct. 2986 (2007). And it is generally improper for prosecutors to bolster a police witness's good character even if the record supports such argument. *See State v. Smith*, 67 Wn. App. 838, 844-45, 841 P.2d 76 (1992) (following line of cases from other states holding prosecutorial misconduct occurred when the State bolstered police witnesses' credibility with evidence that they received commendations and awards or had distinguished careers).

¶23 Not only did the prosecutor's argument here bolster Officer Elliott's character, it did so by using facts not in evidence, namely that police (1) would suffer professional repercussions if they used an untrustworthy informant and (2) would have discontinued using an informant if they doubted his sobriety or trustworthiness. Similarly, the

argument improperly bolstered the CI's character based on facts not in evidence that the police use the same informants repeatedly, as the CI in this case, because (1) those informants are "reliable" and "can be trusted"; (2) "when they say something happens, it happens"; (3) "[w]hen they are instructed to do something, they do it"; (4) "[t]hey don't steal money from the police"; (5) and "[t]hey don't take the buy funds and secretly hide them in a compartment only to be distrusted and discovered later on." RP (Feb. 22, 2006) at 54. None of these "facts" were in evidence; Officer Elliott, who described the CI's role and history, said nothing about his credibility or trustworthiness. The prosecutor's argument constituted misconduct because it sought to bolster the CI's and Elliott's credibility based on highly prejudicial "facts" that were not in evidence.

## C. Cross-Examination about CI's Motives

¶24 Jones further argues that the prosecutor committed misconduct by asking Officer Elliott questions about why the CI did not testify at trial during the redirect examination. We agree that the prosecutor's questions were improper.

¶25 During its direct examination of Officer Elliott, the State did not ask any questions regarding why the CI did not testify at trial. But on cross-examination, Jones asked Elliott, "So [the CI] has actually dropped out of sight, hasn't he?" RP (Feb. 21, 2006) at 94. Elliott replied, "Yes." RP (Feb. 21, 2006) at 94. Jones then asked Elliott, "There's a warrant out for his arrest?" RP (Feb. 21, 2006) at 94. Elliott replied, "Yes, there is." RP (Feb. 21, 2006) at 94. The State did not object.

¶26 Following this exchange, on redirect examination, the State asked Officer Elliott about the last time he saw the CI and why he was unable to find him. Then the State asked Elliott, "The last time you saw him, did he appear excited about testifying?" RP (Feb. 21, 2006) at 95. Elliott replied, "He was very concerned and excited." RP (Feb. 21, 2006) at 95. Over Jones's objection, Elliott explained his

answer, "He told me he was frightened." RP (Feb. 21, 2006) at 95.

¶27 The State argues its redirect examination was proper because Jones had opened the door to questioning why the CI did not testify. We discuss the proper role of the "opening the door" doctrine below. We note that arguably Jones's question about whether an arrest warrant had been issued may have been relevant to the trial court's consideration of a missing witness instruction, but it was not a proper subject for the jury and it exceeded the scope of direct examination and, therefore, was clearly objectionable. The prosecutor's proper course of action was to object to Jones's question. The prosecutor did not object. Instead, she seized the opportunity to admit otherwise clearly inadmissible and inflammatory hearsay evidence that the CI had said that he was afraid to testify, implying that he was afraid of Jones.

¶28 A prosecutor's duty is not merely to zealously advocate for the State, but also to ensure the accused receives a fair trial. *Huson*, 73 Wn.2d at 663. A criminal defendant can "open the door" to testimony on a particular subject matter, but he does so under the rules of evidence. A defendant has no power to "open the door" to prosecutorial misconduct. We hold that the State's redirect examination was improper, but we decline to rule whether it alone requires reversal of Jones's conviction.

D. Speculating about CI's Motivations

¶29 Jones further argues that the prosecutor committed misconduct during rebuttal closing argument because she made prejudicial statements and vouched for the credibility of the CI and Officer Elliott. Again, we agree.

¶30 Here, in his closing argument, Jones's counsel said:

And when it comes time, what's the one piece of evidence you don't have here? You don't have [the CI] saying, yes, he handed me some drugs and he handed me some money. He apparently did something else wrong after this incident. Now there is a warrant out for his arrest. And that in itself is reason to doubt.

RP (Feb. 22, 2006) at 47-48. And the prosecutor argued:

Now where is [the CI]? There's lots of discussion of where is [the CI] today. You know, when you were sitting over there as prospective jurors, we had a discussion about what if an informant doesn't show up. Are there reasons for that? One issue came out that, well, [he] could be in the hospital. Another – I used juror 12 at the time and said, hey, you know, maybe he's not going to testify because his identity would be revealed.

[DEFENSE COUNSEL]: Your Honor; I would ask that counsel not ask the jury to speculate as to matters that aren't in evidence.

THE COURT: You may make your argument about this issue from the evidence.

[PROSECUTOR]: Now, what do we know from the evidence? We know there is a reason why [the CI] isn't here. You heard Detective Elliott tell you all of the attempts he made of this 15-year relationship he's had with [the CI]. He knows [the CI]. He knows where he lives. He knows his family. He knows what he does. He knows [the CI] well. They started out as friends before he ever started helping the police catch drug dealers.

Where is [the CI]? Why wouldn't [he] show up? We heard from Detective Elliott that [the CI] was frightened. We heard that he was afraid to appear. Why do we know he was afraid? Well, we heard from Detective Elliott that is the case they know each other well. In addition to that, this was only one drug deal. The first of a planned many, right? The first. Well, what does that tell you?

You can infer from what you hear that [the CI] was afraid. Why would he be afraid?

[DEFENSE COUNSEL]: Your Honor, I'm going to make the same request that we not ask the jury to speculate as to matters not in evidence.

[PROSECUTOR]: It's a reasonable inference from the evidence.

THE COURT: You may complete your argument.

[PROSECUTOR]: So what do we infer from the evidence before us? We can infer that, well, we had one deal with [Jones], and that [the CI] was discovered.

And why would he be frightened and not want to testify in this particular trial? Because he's afraid of [Jones]. Well, that makes sense now, doesn't it? Somebody who has a 15-year history of being around, and all of a sudden he's afraid to come and testify.

Told you he got paid for a reason. It's because he placed his life in danger. This is not easy work. It's scary work. It's dangerous work.

[Jones] gets his haircut at the barber shop where [the CI] works. That's how they know each other. Who else works there? [The CI's] family does, his dad, his mom. It's a family-owned shop. He has every reason to be afraid because his whole family has been discovered now. Ladies and gentlemen, put your thinking caps on —

[DEFENSE COUNSEL]: Your Honor, I'm sorry, but I have to make the same objection.

THE COURT: You do need to move on in your argument.

[PROSECUTOR]: Use your common sense.

RP (Feb. 22, 2006) at 54-57.

¶31 The State's argument here was wholly improper. It is riddled with prejudicial statements of "fact" that are not in evidence, including that (1) the CI did not testify because his identity would be revealed, (2) the CI was credible and trustworthy because he had been friends with Officer Elliott for 15 years, (3) the CI did not testify because he was afraid of Jones, (4) Jones had discovered that the CI provided police with evidence against him, (5) Jones was "dangerous," and (6) Jones was a threat to the CI and his family. Despite numerous objections and admonitions by the trial court, the prosecutor persistently argued in this highly inflammatory and improper manner.

E. Invited Error and Opening the Door Doctrines

¶32 On appeal, the State argues that Jones invited any of these errors when he opened the door to evidence and speculation about why the CI did not testify. But the State misconstrues the doctrines of opening the door and invited

error. The doctrines are not synonymous and neither excuses the State's fair trial duties here.

▉ ▉ ¶33 The "opening the door" doctrine is an evidence doctrine that pertains to whether certain subject matter is admissible at trial. The term is used in two contexts:

> (1) a party who introduces evidence of questionable admissibility may open the door to rebuttal with evidence that would otherwise be inadmissible, and (2) a party who is the first to raise a particular subject at trial may open the door to evidence offered to explain, clarify, or contradict the party's evidence.

5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.14, at 66-67 (5th ed. 2007). Because this "opening the door" doctrine pertains to the admissibility of evidence, it must give way to constitutional concerns such as the right to a fair trial. *See State v. Frawley*, 140 Wn. App. 713, 720, 167 P.3d 593 (2007) (ruling that constitutional concerns trump strict application of court rules); *and see* ER 402 (allowing trial court to rule that otherwise relevant evidence is admissible if admission would violate constitutional protections). Thus, even if Jones had "opened the door" to evidence or examination of a particular *subject* at trial, the prosecutor is not absolved of her ethical duty to ensure a fair trial by presenting only competent evidence on this subject. Officer Elliott's opinion and the CI's alleged heresay statement are not such evidence.

▉ ▉ ¶34 The invited error doctrine, on the other hand, applies when a party induces the *trial court* to err. *See State v. Henderson*, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990) (discussing doctrine). Parties cannot "err" within the word's meaning in appellate review. *See* RAP 10.3(a)(4) (requiring appellants to state "each error a party contends was made by the *trial court*" (emphasis added)). Under the invited error doctrine, we may decline to review a claimed trial court error if the appealing party induced the court to make the error. *Henderson*, 114 Wn.2d at 870. For example, we have applied this doctrine when a criminal defendant (1)

complained of a faulty jury instruction that he requested, (2) appealed the denial of his motion to dismiss an information as defective when he had successfully opposed the State's motion to amend the information to cure the defect, and (3) appealed the admission of evidence after he stipulated it was admissible in his plea agreement. *State v. Korum*, 157 Wn.2d 614, 649, 141 P.3d 13 (2006) (evidence); *Henderson*, 114 Wn.2d at 870-71 (jury instruction); *State v. Armstrong*, 69 Wn. App. 430, 434-35, 848 P.2d 1322 (information), *review denied*, 122 Wn.2d 1005 (1993). In these and all other cases, the doctrine of invited error pertains to trial court errors that the party set up below. We have not found one published case in which a Washington court applied the invited error doctrine in the context of prosecutorial misconduct for which the trial court's alleged "error" is in entering a conviction against a defendant who did not receive a fair trial. We hold that the invited error doctrine does not apply to prosecutorial misconduct.

¶35 We note that our holding that the invited error doctrine does not apply to prosecutorial misconduct does not prejudice the State. First, a defendant who fails to object to an improper remark waives the right to assert prosecutorial misconduct unless the remark was so " 'flagrant and ill intentioned' that it causes enduring and resulting prejudice that a curative instruction could not have remedied." *Boehning*, 127 Wn. App. at 518 (quoting *Russell*, 125 Wn.2d at 86). Second, improper remarks by the prosecutor are not grounds for reversal " 'if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.' " *Weber*, 159 Wn.2d at 276-77 (quoting *Russell*, 125 Wn.2d at 86). These onerous standards of review prevent defendants from provoking or passively accepting the State's improper conduct at trial in order to undermine the validity of their convictions on appeal. Neither exception excuses the State's conduct here.

## F. PREJUDICE

¶36 Having found several instances of misconduct, we now must determine whether (1) Jones waived his right to object and (2) " 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.' " *Dhaliwal*, 150 Wn.2d at 578 (quoting *Pirtle*, 127 Wn.2d at 672).

### 1. NOT WAIVED

¶37 We first hold that Jones did not waive his right to object to Officer Elliott's opinion testimony or the prosecution's arguments that were not supported by the record when he raised the subject of why the CI did not testify. We note that a prosecutor's misconduct is not grounds for reversal if the remarks " 'were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.' " *Weber*, 159 Wn.2d at 276-77 (quoting *Russell*, 125 Wn. 2d at 86). But here, the prosecutor's replies were not pertinent. Jones quickly and simply shed light on the facts that the CI could not be found and that there was a warrant out for his arrest. The prosecutor did not respond by offering a copy of the arrest warrant or the supporting affidavit. Instead, in closing argument, she (1) speculated that the witness did not appear because Jones was dangerous and the CI feared he would harm him and his family and (2) vouched for the credibility of the absent CI and Officer Elliott. Our review of the record reveals that this misconduct was so prejudicial that curative instructions would be ineffective.

### 2. SUBSTANTIAL LIKELIHOOD VERDICT WAS AFFECTED

¶38 There is also a substantial likelihood that the cumulative effect of the errors affected the verdict, thus depriving Jones of a fair trial. Because neither Jones nor the CI testified, the verdict depended substantially on

whether the jury found Officer Elliott's testimony credible. The surveillance tapes did not capture the exchange and the CI did not testify that Jones provided him with the cocaine, rather than the other person present. "Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." *Weber*, 159 Wn.2d at 279. Accordingly, we hold here that there is a substantial likelihood that the numerous instances of misconduct had a cumulative effect of depriving Jones of a fair trial.

SUFFICIENCY OF THE EVIDENCE

¶39 Next Jones argues in his direct appeal and statement of additional grounds for relief (SAG)[5] that the evidence was insufficient to support his conviction. Specifically, Jones claims that the evidence was insufficient to show that he was the person who delivered the cocaine. If the evidence is insufficient, the case must be dismissed with prejudice.

¶40 Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980). When a defendant challenges the sufficiency of evidence in a criminal case, we draw all reasonable inferences from the evidence in favor of the State and interpret all reasonable inferences from the evidence strongly against the defendant. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). A claim of insufficiency admits the truth of the State's evidence and all inferences that we reasonably can draw from it. *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980). Finally, we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

[5] *See* RAP 10.10.

¶41 Drawing all reasonable inferences from the evidence in favor of the State and interpreting all reasonable inferences from the evidence most strongly against Jones, we are satisfied that, from the evidence outlined above, a jury could find a reasonable doubt that Jones unlawfully delivered cocaine, a controlled substance.

CI's CREDIBILITY

¶42 In his SAG, Jones also claims that the CI was "intoxicated" during the drug buy. Before the drug buy, the CI stated, "Ah, got me sitting out here in the hot sun with a hangover." Ex. 8, at 4. Later, the CI complained, "Sweating all booze, I got to be. . . . I'm gonna jump in the river at the Valley." Ex. 8, at 7. Based on these statements, Jones essentially argues that the CI was not credible.

¶43 But credibility determinations are for the trier of fact and are not subject to review on appeal. *Thomas*, 150 Wn.2d at 874 (citing *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)). The audio- and videotape recording evidence, if found credible, is legally sufficient to support a finding of guilt and dismissal of the charge is not warranted.

¶44 Accordingly, we reverse and remand for retrial.

ARMSTRONG, J., concurs.

HOUGHTON, C.J., concurs in the result.