FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2018 NOV -5 AM 11: 33

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76962-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JEFFREY JOSEPH BAUS, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 5, 2018 |

ANDRUS, J. — A jury convicted Jeffrey Joseph Baus of rape in the second degree and assault in the second degree. He contends that he was prejudiced by the prosecutor's improper remarks during closing argument. He also challenges the imposition of a condition of community custody prohibiting him from frequenting drug areas, as defined by his community corrections officer. Baus fails to establish prosecutorial misconduct warranting reversal. Because the community custody condition related to drug areas is unconstitutionally vague, we remand to strike the condition. Otherwise, we affirm the judgment and sentence.

FACTS

The State charged Jeffrey Baus, by amended information, with second degree assault and second degree rape.[1] According to the testimony at Baus's trial, R.M. spent the evening of April 22, 2016, at the Quilceda Creek Casino in Marysville. R.M., who was homeless and addicted to heroin, spent a

---

[1] The State initially charged Baus with rape in the third degree.

considerable amount of time at the casino. Friends were often there and it was open all night, warm, and safe.

That evening, R.M.'s plans for the night fell through and she had "nowhere to go." R.M. was distressed and she was wearing four-inch high heels that were "killing" her.

At some point, R.M. noticed Baus, who appeared to be watching her. At around 11 p.m., when R.M.'s friend walked away and she was alone, Baus approached her. Baus commented that she appeared to be having a difficult time. After R.M. explained her situation, Baus said, "today may be your lucky day." Baus told R.M. that he had a house in Granite Falls and invited her there to "hang out" and "[r]elax." Baus assured her there were "[n]o expectations."

R.M. and Baus "flirted a little bit" and talked about Alaska. R.M. grew up in Alaska and Baus said he wanted to retire there. This common interest made R.M. feel slightly more inclined to trust Baus. After an hour or so, Baus suddenly announced that he was leaving and that if R.M. wanted to come with him, it was "now or never." R.M. did not have a cell phone and wanted to find her friend first to tell him where she was going. Baus refused to wait for her.

Although R.M. felt uneasy, she left with Baus. As they drove, they passed the home of one of R.M.'s friends. R.M. asked Baus to stop so she could quickly talk to her friend. Again, he refused.

During the 30-minute drive to Baus's wooded neighborhood, the conversation turned more overtly sexual. Baus told R.M. that she was pretty and

described sex acts he wanted to engage in. R.M. "kind of blew it off" and vaguely said, "[w]ell, I'm not sure about that."

When they arrived at his home, Baus gave R.M. a tour. Baus showed her a survivalist room and told her he had everything necessary for the two of them to "disappear into the woods for a month without anybody knowing where we were." R.M. was afraid, but felt she could not leave without money, a cell phone, or shoes she could easily walk in.

R.M. ate a tuna fish sandwich and some peanut butter. And because she was nervous, she also smoked "three or four hits" of heroin, which was just enough to relax her and make her feel "normal." Meanwhile, Baus continued to drink beer and smoked marijuana. Baus offered R.M. beverages, but she declined, fearing that he might drug her.

Baus let R.M. use the bathroom, but then continually banged on the door, demanding that she come out. R.M. was increasingly worried. Partly to escape from Baus, she asked to take a shower. The pocket door in the master bathroom did not lock properly. A few minutes after R.M. got into the shower, Baus appeared, naked, and tried to enter. R.M. yelled at him to leave. Baus responded, "Oh come on. Don't you see the toys in there? Don't you want to play?" After R.M. continued to yell, he left.

R.M. believed she was truly in danger and started to panic. After her shower, she ran to the other bathroom and locked the door. For about 15 minutes, she sat on the toilet seat while Baus forcefully pounded on the door and badgered her. Finally, because she "had enough" of his yelling and thought he

might break down the door, she opened the door, grabbed her purse, and returned to the master bath. While she tried to calm herself and decide what to do, she took Q-tip cotton swabs from her purse and cleaned her ears.

Then, with a "dark" and "[g]lazed over" look on his face, Baus "body bumped" R.M. When she yelled, he snatched the towel she was wearing, picked her up, and threw her on the bed.[2] He jumped on the bed and straddled her. He tied her wrists and one leg with thin ropes that were already secured to the bedposts. R.M. screamed and tried to free herself. Baus hit her in the face. R.M. felt like her face "exploded" and fluid poured from her nose and mouth. R.M. pleaded with Baus to stop. He shoved his erect penis into her mouth three or four times. She gagged and found it difficult to breathe.

As R.M. continued to plead with him, Baus walked across the room, picked up a knife on his dresser, and "taunted" her with it for about 10 minutes. He held the blade to her skin and moved it over her naked body, touching her legs, vagina, chest, breasts, neck, and arms. R.M. believed he was going to kill her. Then suddenly, using the same knife, Baus cut the restraints. Baus said to R.M., "I don't think this thing is going to work out. Some bitches like this sort of thing."

R.M. retrieved her clothes that were scattered throughout the house. Although she was terrified, R.M. tried to pretend that she was still interested in Baus and was not really hurt. She eventually persuaded Baus to drive her to a nearby Walmart. R.M. rode with the window rolled down and her hand on the

---

[2] R.M. is 4 feet 11 inches tall and weighs 118 pounds, while Baus is 6 feet tall and about 100 pounds heavier.

door handle, so that she could jump out if necessary. En route, Baus changed his mind and said he was taking her back to his house and that she could leave later. As Baus slowed the car to enter a roundabout, R.M. jumped out. Baus gave her the finger and said, "See you, bitch."

R.M. walked along the highway for 30 to 40 minutes until she came to an open service station. The store clerk, Grant Jensen, immediately noticed that R.M. was injured. Her face was bruised and bleeding. R.M. was frantic and crying. She told Jensen that a man beat her up after she refused to have sex. Jensen gave R.M. ice for the swelling on her face, lent her his cell phone, and encouraged her to call 911. R.M. declined to call for assistance because there were warrants for her arrest. A customer later drove R.M. to the Walmart where a friend picked her up.

Over the next 24 hours, R.M. arranged to store her vehicle and other personal items. Then, on the morning of April 24, 2016, a friend drove R.M. back to Baus's home so she could obtain the address and then she called the police.[3] Despite the risk of going to jail, R.M. decided to report the crime because "nobody should do that to anybody."

Michael Mansur and Thomas Dalton of the Snohomish County Sheriff's Office met R.M. at the Granite Falls police station that morning. They observed her recent injuries, including black eyes, an apparently broken nose, and one eye that was nearly swollen shut. There were faint ligature marks on her wrists. R.M. was very emotional and shaken. She identified Baus in a photomontage

---

[3] R.M. was familiar with Baus's neighborhood because she had a friend who lived there and had worked in that neighborhood in the past.

and prepared a written statement. The police officers arranged for R.M. to go to the hospital for treatment. Both at the hospital and earlier at the police station, officers took photographs of R.M.'s injuries. At the hospital, R.M. declined to talk to the forensic nurse examiner.[4]

Items recovered in a search of Baus's home and DNA[5] testing of some of those items corroborated R.M.'s presence in Baus's home and several details of her account.

At trial, in addition to R.M., several witnesses testified on behalf of the State, including Jensen, police officers involved in the investigation, and a Washington State Patrol forensic scientist. Baus did not testify.

Baus did not deny that R.M. had been in his home. The defense argued, however, there was insufficient evidence to establish that the contact between R.M. and Baus occurred on the charging date, "on or about" April 23, 2016. Counsel also pointed out that there was no video surveillance footage from the casino or any other evidence showing that Baus approached R.M., and not the other way around. Considering R.M.'s difficult circumstances at the time and her acknowledgment that she had flirted with Baus, the defense suggested that R.M. may have "prey[ed] on" Baus. The defense also argued that R.M.'s memories and her statement were unreliable because of her drug use and that a sexual assault examination would have shown whether R.M. had sexual intercourse with Baus or someone else. The jury convicted Baus as charged.

---

[4] R.M. felt she did not need a sexual assault exam because she was not vaginally assaulted.

[5] Deoxyribonucleic acid.

Prosecutorial Misconduct

Baus alleges several instances of prosecutorial misconduct during closing and rebuttal argument. We reject this argument as a basis for overturning the conviction.

Prosecutorial misconduct may deprive a defendant of his right to a fair trial. See State v. Jones, 144 Wn. App. 284, 290, 183 P.3d 307 (2008). The appellant bears the burden of demonstrating prosecutorial misconduct on appeal and must establish that the conduct was both improper and prejudicial. State v. Stenson, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997). "Allegedly improper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). Prosecuting attorneys have wide latitude during closing arguments to argue facts and reasonable inferences from the evidence. State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). This latitude allows a prosecutor to "freely comment on witness credibility based on the evidence." State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

To establish prejudice sufficient to require reversal, a defendant who timely objected to the challenged conduct in the trial court must "show a substantial likelihood that the misconduct affected the jury verdict." In re Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Reversal is not required where the alleged error could have been obviated by a curative instruction. State v. Gentry, 125 Wn.2d 570, 596, 888 P.2d 1105 (1995). The "'failure to object to

7

an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" Thorgerson, 172 Wn.2d at 443 (quoting Russell, 125 Wn.2d at 86).

Presumption of Innocence

Baus contends that the prosecutor committed flagrant misconduct by undermining the presumption of innocence. Defense counsel stated in closing argument that the presumption of innocence "continues throughout the entire trial unless, during your deliberations, you find it has been overcome by the evidence beyond a reasonable doubt." Counsel further elaborated, "it's the end of the trial and the law says he sits here right now innocent."

The prosecutor argued in rebuttal,

> Defense counsel started with kind of a discussion of the presumption of innocence. What I heard her say was you're not allowed to come to any other conclusion. Well, that's really not what it says. The defendant is presumed innocent until you're convinced otherwise. It doesn't mean a plea of not guilty means end of story and you just dismiss what anyone else has to say to the contrary. That's not what it means. You evaluate the evidence and you determine whether or not – I mean, why are we here if the presumption of innocence means he's innocent.

During the same argument the prosecutor also described the phrase "an abiding belief" as "something that you believe yesterday, today, tomorrow."

The "presumption of innocence continues 'throughout the entire trial' and may be overcome, if at all, only during the jury's deliberations." State v. Venegas, 155 Wn. App. 507, 524, 228 P.3d 813 (2010) (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed.

8

2008)). The prosecutor's argument did not suggest otherwise. The argument was consistent with the jury's instructions.[6] Unlike the argument at issue in Venegas, the prosecutor did not indicate that the presumption of innocence erodes as the State presents evidence of the defendant's guilt during the trial. Nor did the prosecutor imply that Baus was guilty merely because the State filed charges against him. Rather, the prosecutor emphasized that the presumption of innocence may ultimately be overcome by evidence that meets the State's burden of proof. And to the extent that the prosecutor's explanation of the meaning of abiding belief was inartful in that it included "yesterday," it was not flagrant misconduct.[7]

Burden of Proof

Baus also contends that the prosecutor improperly shifted the burden of proof to the defense in discussing the reasonable doubt instruction. The prosecutor argued,

> Now, the reasonable doubt instruction talks about reasonable doubt being based on evidence or lack of evidence, but it talks about evidence based – I mean reasonable doubt that's based on something; right? So you can't just come here and throw out here's a man's name, here's a man's name. Maybe it's him or maybe she met the defendant three days earlier. Well, where's that come from? Is that, is that the way it works? You can just throw out a possibility over here and a possibility over here and come up with a hypothetical and that's enough reasonable doubt even though it's based on nothing? No. No. The law contemplates that it's based

---

[6] Instruction No. 4 provides, in relevant part: "A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt." The same instruction also states that jurors are "satisfied beyond a reasonable doubt," if after fairly and carefully considering all the evidence, they have an "abiding belief in the truth of the charge."

[7] Dictionary definitions of "abiding" include "continuing or persisting in the same state without changing or diminishing" and "enduring." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 3 (2002).

on something. The doubt is based on something, not on the fact there is a possibility that this potential hypothetical might happen and there's other men who she had contact with that week.

The court overruled the defendant's objection, stating, "[I]t's argument. The law has been given and is clear."

Baus argues that the prosecutor's argument is comparable to impermissible "fill-in-the-blank" remarks like those at issue in State v. Emery, 174 Wn.2d 741 (2012). In Emery, the prosecutor argued,

> [I]n order for you to find the defendant not guilty, you have to ask yourselves or you'd have to say, quote, I doubt the defendant is guilty, and my reason is blank. A doubt for which a reason exists. If you think that you have a doubt, you must fill in that blank.

174 Wn.2d at 750-51. The "fill-in-the-blank" argument was improper because it "subtly shifts the burden to the defense" by requiring the jury to articulate a reason to doubt. Emery, 174 Wn.2d at 760.

But here, the prosecutor did not tell the jury it had to be able to articulate a specific reason for doubting Baus's guilt before it could acquit. The prosecutor instead argued that based on the evidence before it, there was no reason to doubt his guilt. The instructions and the State's argument properly informed the jury that the State bore the burden of proof. The State's argument did not impermissibly shift the burden of proof.

Denigration of Defense Counsel

Baus argues that the prosecutor engaged in misconduct by denigrating his counsel and defense counsel's role. The prosecutor began closing argument by reminding the jury that, regardless of R.M.'s personal circumstances and poor

10

choices, she was entitled to personal security. The prosecutor then recounted some of the obstacles and indignities that R.M. endured in order to pursue justice, including being questioned by the police and an investigator, being photographed, and being treated unsympathetically at the hospital because of her addiction.

The prosecutor then discussed how the trial itself subjected R.M. to further humiliation because she was questioned by both counsel, challenged by defense counsel, and "put under a microscope:"

> She has to sit there (indicating) and she has to tell a room full of strangers about her weaknesses, about her life, about her mistakes, about the most terrifying thing that has ever happened to her, something that none of us could ever imagine in front of the guy that did it to her. I put her up there and I asked her to tell me all these things, to explain why she did what she did, to tell me about her bad decisions, and then when she breaks down describing how she was pleading for her life, begging to have a chance to see her child again, I coldly make her keep going: What happened next?
>
> But that's not the end. Then the defendant's lawyer starts asking her questions insinuating her bad choices, saying things like do you expect us to believe that? See, in ordinary polite society, we don't talk to each other like that. If you were telling somebody something, something humiliating, horrible and terrifying and they said to you, do you expect us to believe that - - -[8]

The trial court sustained defense counsel's objection, and instructed the prosecutor to "move on." Defense counsel did not request a curative instruction.

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." Thorgerson, 172 Wn.2d at 451 (prosecutor engaged in misconduct by referring to defense counsel's

---

[8] During cross-examination, defense counsel questioned R.M. about her written statement in which she indicated that at a point during the attack she "start[ed] to calm down a bit" and asked, "So are we supposed to believe that?"

11

presentation of his case as "bogus" and involving "sleight of hand," but the misconduct did not likely affect the verdict). A prosecutor's statements that malign defense counsel are impermissible because they can damage a defendant's opportunity to present his or her case. State v. Lindsay, 180 Wn.2d 423, 432, 326 P.3d 125 (2014). But comments that "can fairly be said to focus on the evidence" do not constitute misconduct. Thorgerson, 172 Wn.2d at 451.

The prosecutor's comment suggesting that defense counsel challenged the victim's testimony in a manner that was offensive to "polite society" was disparaging to defense counsel. See Thorgerson, 172 Wn.2d at 452. However, the larger context of the argument was not a personal attack on defense counsel or counsel's strategy. Rather, the prosecutor was reminding the jury that R.M. faced significant challenges in coming forward with her allegations. Counsel highlighted the fact that all participants in the process—including the prosecutor, the defense, and law enforcement—subjected R.M. to uncomfortable and unwanted scrutiny. The prosecutor encouraged the jury to consider these facts in evaluating R.M.'s credibility.

The trial court sustained defense counsel's timely objection and specifically instructed the prosecutor to abandon her line of argument. To the extent there was any residual prejudice, it could have been neutralized by an instruction to disregard the argument. In State v. Lindsay, the prosecutor characterized the defense's argument a "crock" and engaged in numerous other instances of misconduct. Lindsay, 180 Wn.2d at 442-43. Our Supreme Court determined that the cumulative effect of the repeated and prejudicial misconduct

could not have been cured by any instruction or series of instructions. Lindsay, 180 Wn.2d at 443. But here, the misconduct was neither repeated nor pervasive. Considering the larger context of the argument, the limited nature of the inappropriate remarks, and the weight of the evidence against Baus, there is not a substantial likelihood that the prosecutor's comments about the manner in which defense counsel questioned the victim affected the jury's verdict.

We conclude Baus has not established prosecutorial misconduct warranting a reversal of his conviction.

### Condition of Community Custody

At sentencing, the trial court imposed a condition of community custody requiring Baus to avoid "drug areas, as defined in writing by the supervising Community Corrections Officer" (CCO). Baus contends this condition is unconstitutionally vague. We agree.

The guarantee of due process requires that laws, including sentencing conditions, not be vague. U.S. CONST. amend. XIV, § 1; WASH.CONST. art. 1, § 3; State v. Irwin, 191 Wn. App. 644, 652, 364 P.3d 830 (2015). To withstand a vagueness challenge, a condition of sentence must (1) provide ordinary people fair warning of proscribed conduct, and (2) have standards that are sufficiently definite enough to protect against arbitrary enforcement. State v. Bahl, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008); Irwin, 191 Wn. App. at 652-53. Failure to satisfy either prong renders the condition unconstitutional. Irwin, 191 Wn. App. at 653.

In <u>Irwin</u>, this court held that a similar community custody condition requiring further definition by a CCO was unconstitutionally vague. <u>Irwin</u>, 191 Wn. App. 652. A condition of sentence barred Irwin from places where "children are known to congregate," as defined by his CCO. <u>Irwin</u>, 191 Wn. App. 655. This court concluded that "[w]ithout some clarifying language or an illustrative list of prohibited locations . . . the condition does not give ordinary people sufficient notice to 'understand what conduct is proscribed.'" <u>Irwin</u>, 191 Wn. App. 655. Moreover, the authority given to the CCO to interpret the condition allowed for unconstitutionally arbitrary enforcement. <u>Irwin</u>, 191 Wn. App. 655.

Likewise here, leaving the definition of "drug areas" subject to the CCO's discretion deprives Baus of fair warning of the proscribed conduct. And while it is true that he may have notice of prohibited conduct once the CCO sets forth a definition of "drug areas" in writing, the condition still fails under the second prong of vagueness analysis because it is vulnerable to arbitrary enforcement. <u>See</u> <u>Irwin</u>, 191 Wn. App. at 655. For these reasons, the condition of community custody related to "drug areas" is unconstitutionally vague.

Accordingly, we affirm Baus's convictions, but remand to strike the challenged condition of community custody.

Andrus, J.

WE CONCUR:

Chun, J.

Becker, J.

14