# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

THE STATE OF WASHINGTON, )
)    No. 80346-8-I
            Respondent, )
)    ORDER GRANTING MOTION
            v. )    FOR RECONSIDERATION
)    AND WITHDRAWING AND
BRUNO D. MOLINA, )    SUBSTITUTING OPINION
)
)
            Appellant. )
)

The appellant, Bruno Molina, has filed a motion for reconsideration of the opinion filed on January 19, 2021. The State has not filed a response to the motion. The court has determined that the motion should be granted, and the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration granted; and it is further

ORDERED that the opinion filed on January 19, 2021 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Appelwick, J._

_Brunm, J_    _Dwyr, J._

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 80346-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| BRUNO D. MOLINA, | |
| Appellant. | |

APPELWICK, J. — Molina appeals his convictions for second degree assault and fourth degree assault. He argues reversal is required based on ineffective assistance of counsel, prosecutorial misconduct, and legal financial obligations assessed in error. We affirm his convictions, but remand to strike certain legal financial obligations.

## FACTS

On January 29, 2018 Bruno Molina, age 20, drove to his friend's party. Molina drank a beer with his friend. A.P., N.W., and A.H., all ages 14 to 15 were also at the party together. The three had been invited and driven there by Israel Hermosillo-Alvarez. A witness later testified that the three girls Israel brought were all drunk at the party. A.P. stated she drank five beers.

Later in the evening, Israel[1] passed out in the backseat of his car due to intoxication. Emanuel Espana decided to drive Israel's car to help the young women and Israel get home. Molina gave A.P. a ride, as there was not room in Israel's car. Espana told Molina to meet them at a McDonald's restaurant parking lot.

Molina and A.P. arrived at the McDonald's before Espana, and the two waited in his car. Molina and A.P.'s stories differed about what happened before the other group arrived.

Molina testified that A.P. asked him if he had a girlfriend and tried to kiss him, leading to him getting out of the car. Molina claimed he tried to get A.P. out of the car because he was concerned A.P. would spill alcohol she had brought from the party in the car. He claimed she did not want to get out, and she called him derogatory names.

According to A.P., Molina had asked her to perform oral sex on him, which she refused. She said he kissed her, and afterward she told him to stop touching her. According to A.P., he then put his hand down her pants and digitally penetrated her vagina. She told him to stop, elbowed him, and got out of the car.

As A.P. was exiting Molina's car, Israel's car arrived. A.P. approached the car and gave N.W. and A.H. her account of what happened. Molina told Espana to calm A.P. down. Espana asked Molina to wait until Israel's older brother, Josue

---

[1] This case involves two witnesses, brothers Israel Hermosillo-Alvarez and Josue Hermosillo-Alvarez. For clarity, they are each referred to by their first names.

Hermosillo-Alvarez, came to pick up Israel and his car, because Molina was his only ride home.

Molina said he then asked A.P., "Could I help you [get] in the car?" He said A.P. did not want to try to move Israel, so he opened the driver's side door and "tried to put her in slowly." Molina claims he accidentally shut the car door on her leg. Angered, A.P. got out of the car and began to chase Molina around the two cars. N.W. later testified that A.P. "was trying to hit him or something like that." Molina initially found the situation humorous. He claimed he eventually felt the need to defend himself. He hit A.P. in the face, causing her to fall to the ground. Molina recalled A.P. getting back up right after falling. A.P. said she lost consciousness, which N.W. corroborated.

N.W. exited the car and approached Molina. At trial, witnesses gave differing accounts of what N.W. said and her demeanor as she approached Molina. N.W. said she checked on A.P. and then asked Molina why he had punched A.P. Josue said she ran towards Molina to fight him. Molina then hit her in the face. Molina claimed this was instinctive, as he believed N.W. was going to try to throw a punch at him. Molina testified that A.P. and N.W.'s friend then came out of the car and tried to do the same thing, but Espana got between them and told Molina to go home. Molina then left the parking lot.

The day after the party, A.P. went to the hospital accompanied by her mother. She told hospital staff that someone had tried to force her to have oral sex and had touched her vagina.

3

The State charged Molina with third degree rape and second degree assault of A.P. It also charged Molina with fourth degree assault of N.W.

At trial, the State called Israel's older brother Josue as a witness. He testified that he had driven to McDonald's the night of the incident because he was alarmed that Israel was intoxicated. Josue testified that he saw Molina punch the two girls and that A.P. "had fallen and she had gotten back up."

Molina's attorney did not ask for a jury instruction on self-defense or argue self-defense. During closing arguments, Molina's attorney conceded that Molina had hit A.P. and N.W., but denied the rape and argued the conduct did not rise to second degree assault. In arguing the State had failed to prove second degree assault beyond a reasonable doubt, Molina's attorney noted, "Josue Hermosillo testified that he saw [A.P.] get hit and get back up. . . . She did not lose consciousness."

During its closing argument, the State said Josue had "corroborated" A.P.'s story and "saw her getting knocked to the ground." Molina objected that the State was arguing facts not in evidence, but was overruled.

The prosecutor also said, "Why would [A.P.] come in here, swear under oath and tell you a story that she made up?" Molina objected and his objection was overruled. Twice more the State asked what A.P. would have to gain from moving forward with the case and testifying. Both times Molina objected and was again overruled.

The jury acquitted Molina of the rape charge, but convicted him of second degree assault and fourth degree assault. At sentencing, the trial court imposed several fees, including a $100 DNA (deoxyriboneucleic acid) collection fee, a $500 victim penalty assessment for each conviction, and a supervision fee.

Molina appeals.

## DISCUSSION

Molina asserts his judgment and sentence must be reversed based on claims of ineffective assistance of counsel and prosecutorial misconduct. Further, he asserts remand is necessary to remedy the improper imposition of legal financial obligations.

I. Ineffective Assistance of Counsel

First, Molina asserts his attorney's failure to argue self-defense and request a self-defense instruction deprived him of his right to effective assistance of counsel.

Criminal defendants are guaranteed the right to effective assistance of counsel under our state and federal constitutions. U.S. CONST. amend. VI; CONST. art. I, § 22; Strickland v. Washington, 466 U.S. 668, 680, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Thomas, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). To prevail on an ineffective assistance of counsel claim, the defendant must show that counsel's performance was deficient and that the defendant was prejudiced by that deficiency. Strickland, 466 U.S. at 687; In re Pers. Restraint of Crace, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012). Scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness. In re Pers. Restraint

of Lui, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). To rebut the presumption of reasonableness, a defendant must establish the absence of any legitimate trial tactic that would explain counsel's performance. Id.

Molina argues because force used in self-defense is lawful and the threshold burden of production for a self-defense instruction is low, failing to ask for such an instruction constituted deficient performance. Further, he argues "as the jury was properly instructed to consider each charge separately, there was no downside in obtaining a self-defense instruction."

But, given the facts in Molina's case, deciding not to seek a self-defense instruction was a legitimate trial tactic. This decision did not constitute ineffective assistance of counsel.

Molina may have had sufficient evidence to entitle him to a self-defense instruction. But, to actually establish self-defense, Molina would need to show that he had a good faith belief in the necessity of force and that that belief was objectively reasonable. State v. Dyson, 90 Wn. App. 433, 438-39, 952 P.2d 1097 (1997). RCW 9A.16.020(3) provides that the use of force upon another person is not unlawful when used by a person about to be injured "in preventing or attempting to prevent an offense against his or her person . . . in case the force is not more than is necessary." (Emphasis added.)

Molina's counsel could have decided a jury would find that Molina's force was "more than necessary" given the facts. Id. Molina was larger and heavier than A.P. A.P. was five feet, four inches tall and weighed 125 pounds. Molina was five feet, ten inches tall and weighed 155 pounds. A.P. admitted to drinking five

beers, and a witness had testified she was drunk at the party. Molina was also 5 to 6 years older than A.P., and testified he knew he was "quite a bit older" at the time of the incident. When he stop running from A.P., he struck her with such force that she was knocked down and may have been rendered unconscious. This suggests the use of more force than was necessary to prevent injury from a smaller, intoxicated minor.

Molina also testified that he laughed when A.P. began to chase him around the cars "because [he] thought it was kind of funny that [he was] being chased around by a girl." This testimony undercuts the suggestion that he was afraid he was about to be injured.

Arguing self-defense in these circumstances could have undercut Molina's credibility with the jury. He needed credibility with the jury, because the evidence regarding whether he knocked A.P. unconscious and whether he committed third degree rape largely came down to his testimony versus that of A.P. It was a reasonable litigation strategy to concede the assaults occurred and focus on disputing the degree of the assault and the third degree rape charge.

Further, this strategy allowed Molina to show contrition before the court. Molina testified that he regretted hitting both A.P. and N.W. He said, in retrospect, perhaps he should have run away or held A.P. He would not have been able to demonstrate his regrets had he attempted to argue his actions were justified. At sentencing, the trial court noted, "I've given this one a lot of thought because of what I saw and heard at trial and because of what I believe to be some measure of contrition and remorse on Mr. Molina's part." The court did not sentence Molina

at the top end of the sentencing range as requested by the State. So, the decision not to argue self-defense may have benefitted Molina at sentencing.

We find no ineffective assistance of counsel under Strickland. Nonetheless, Molina argues that even if his claim does not satisfy the Strickland standard, "counsel's decision to concede guilt rather than argue self-defense" was "per se illegitimate under McCoy v. Louisiana, __ U.S. __, 138 S. Ct. 1500, 200 L. Ed. 2d 281 (2018)."

In McCoy, the Court addressed "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." Id. at 1507. It held the autonomy to decide that the objective of the defense is to assert innocence is reserved for the defendant. Id. at 1508. Defendant McCoy consistently asserted an alibi, and expressly opposed counsel's "assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." Id. at 1509. So, the Court held that defense counsel violated McCoy's autonomy by conceding that McCoy had committed three murders. Id. at 1507, 1511.

But, concession strategies are not per se improper where a client has pleaded innocent. See Id. at 1509. The McCoy Court clarified that its holding was not contrary to its prior case, Florida v. Nixon, 543 U.S. 175, 178125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). Id. In Nixon, under a traditional Strickland analysis, the Court held that no blanket rule impeded defense counsel's guilt concession strategy where the defendant had not objected or protested to his counsel's guilt concession strategy. 543 U.S. at 178, 192. The McCoy Court noted that Nixon

8

never verbally approved or protested counsel's strategy, complaining about the admission of his guilt only after trial. McCoy, 138 S. Ct. at 1509. In contrast, McCoy had "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." Id. at 1505.

Here, there is no evidence Molina ever raised concern about defense counsel's trial strategy with counsel or the court. Molina does not claim to have asserted to counsel that his testimony represented an objective to maintain his innocence. At closing, Molina's counsel stated,

> Mr. Molina is not guilty of Assault in the Second Degree. The Second Degree assault is the more serious charge that requires substantial bodily injury. Assault in the Fourth Degree is the less serious assault.
>
> Mr. Molina hit [A.P.], he testified to that. He felt justified at the time, but he soon realized there's no justification for hitting her. The evidence shows that despite her claim[, s]he did not lose consciousness.

Rather than contradicting her client, defense counsel reiterated his testimony. Her argument that Molina's actions constituted the lesser assault charge was consistent with his own concessions at trial. As in Nixon, counsel did not negate Molina's autonomy by overriding his desired defense objective, because Molina never asserted any such objective. McCoy, 138 S. Ct. at 1509.

We find no ineffective assistance of counsel.

## II. Prosecutorial Misconduct

Next, Molina asserts that prosecutorial misconduct during closing argument deprived Molina of his right to a fair trial.

Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard. State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995). The defendant bears the burden of establishing that the conduct was both improper and prejudicial. State v. Song Wang, 5 Wn. App. 2d 12, 30, 424 P.3d 1251 (2018). "Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432, 442 (2003). To establish prejudice, the defendant must show a substantial likelihood that the error affected the jury verdict. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

Molina asserts the prosecutor committed misconduct during closing argument by misrepresenting the evidence about whether Josue's testimony corroborated the fact that A.P. was knocked unconscious.

When asked what happened with the first girl Molina had punched, Josue stated that she "had fallen and she had gotten back up." But, during the prosecutor's closing argument, the following exchange occurred:

> [Prosecutor]: [A.P.] told you that she fell to the ground, that she lost consciousness. Her friends corroborated that too. In fact, even [Josue], whom she doesn't know very well corroborated that.
>
> [Defense Counsel]: Objection. Arguing facts not [in] evidence, Your Honor.
>
> THE COURT: Overruled.

The prosecutor overstated the degree to which Josue corroborated A.P.'s testimony. However, Josue corroborated that A.P. was hit and fell to the ground.

He stated that she got back up, but not how long it took her to do so. Any potential confusion was further ameliorated by defense counsel reaffirming in its own closing argument after the above exchange that "Josue Hermosillo testified that he saw her get hit and get back up." And, the trial court instructed the jurors to disregard any remarks by the attorneys the evidence did not support. We presume the jurors followed the court's instructions. State v. Hopson, 113 Wn.2d 273, 287, 778 P.2d 1014 (1989). To the extent Molina argues the repeated overruling of his objections "likely gave the jury the impression that the prosecutor's argument was proper," the jurors were also instructed against drawing such conclusions. Nothing suggests that the remarks affected the jury verdict.

Molina further asserts the prosecutor improperly vouched for the credibility of A.P. during closing argument. It is improper for a prosecutor personally to vouch for the credibility of a witness. State v. Sargent, 40 Wn. App. 340, 343-44, 698 P.2d 598 (1985). "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010).

But, in closing argument, a prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury. State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). Prejudicial error will not be found unless it is "clear and unmistakable" that counsel is expressing a personal opinion. Sargent, 40 Wn. App. at 344.

11

Molina relies on State v. Jones, 144 Wn. App. 284, 293, 183 P.3d 307 (2008). This case is distinguishable. In Jones, the State argued that a confidential informant was credible because the police would have discontinued using an untrustworthy informant. Id. at 293-94. That argument clearly placed the prestige of the government behind the informant.

Here, the prosecutor did not state that she personally found A.P. to be credible or indicate that external evidence supported A.P.'s credibility. While a prosecutor may not vouch for a witness's credibility, a prosecutor may freely comment on witness credibility based on evidence. See State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

Molina also argues the prosecutor's statements "implied to the jury that in order to find the State had not proved its case beyond a reasonable doubt, the jury had to find that [A.P.] had lied under oath." We disagree.

Molina focuses on a segment of the prosecutor's closing where she asked "Why would [A.P.] come in here, swear under oath and tell you a story that she made up?" This court has held a prosecutor's statement that a witness had no motive to lie was not impermissible vouching. State v. Robinson, 189 Wn. App. 877, 893-94, 359 P.3d 874 (2015). There, the court found the prosecutor's comments were argument that the trial evidence demonstrated the witness had no reason to lie. Id. at 894. Likewise, the rhetorical questions posed by the prosecutor in Molina's case drew reasonable inferences from the trial court record about A.P.'s lack of motivation to lie.

We find the prosecutor did not commit prosecutorial misconduct in closing argument.

III. Legal Financial Obligations

Finally, Molina asserts that a DNA collection fee, a second $500 victim penalty assessment, and discretionary supervision fees were each assessed in error. The State concedes that all three legal financial obligations should be stricken from the judgment and sentence. We agree.

First, Molina asserts the $100 DNA collection fee should be stricken. RCW 43.43.754 requires the collection of a DNA sample from every adult or juvenile convicted of a felony. Individuals sentenced for crimes specified in RCW 43.43.754 must pay a $100 DNA collection fee, unless their DNA was previously collected as a result of a prior conviction. RCW 43.43.7541.

At sentencing, the trial court imposed a $100 DNA collection fee. But, Molina had two prior felony convictions as a juvenile. The State concedes its records show that Molina had submitted a DNA sample prior to sentencing in this case. The $100 DNA fee should not have been imposed. Striking the fee is required under Ramirez, consistent with the State's records indicating Molina's DNA had previously been collected. State v. Ramirez, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

Second, Molina argues the trial court improperly imposed two $500 victim penalty assessments rather than a single $500 penalty assessment. RCW 7.68.035(1)(a) mandates one $500 victim penalty requirement "for each case or cause of action that includes one or more convictions of a felony or gross

13

misdemeanor." Molina was convicted of two counts of assault under a single cause number. So, only one $500 penalty should have been assessed. At sentencing, the court stated with regards to the $500 penalty that its "intention, of course, is not that it be double collected for the sake of the record." However, this statement is not included in the judgment and sentences. The written orders impose two assessments, one in the felony judgment and sentence on the second degree assault conviction and a second in the nonfelony judgment and sentence on the fourth degree assault conviction. Washington is a written order state. State v. Huckins, 5 Wn. App. 2d 457, 469, 426 P.3d 797 (2018). The written order is controlling and the trial court's oral statements at sentencing are no more than a verbal expression of its informal opinion at the time. Id. One fee must be stricken.

Third, Molina argues that discretionary supervision fees should not have been imposed due to his indigency. The supervision fees were not imposed at sentencing. The State conceded that the court intended to waive any nonmandatory fees but imposed the supervision fee because of its inclusion on a stock form. We accept that concession.

We affirm the judgment and sentence, but remand to strike the DNA collection fee, the second victim penalty assessment, and the discretionary supervision fees.

Appelwick, J.

WE CONCUR:

Brennan, J.          Dwyer, J.