# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36432-1-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 37546-3-III) |
| | ) | |
| v. | ) | |
| | ) | |
| SLOAN PATRICK STANLEY, | ) | ORDER DENYING |
| | ) | MOTIONS FOR |
| Appellant. | ) | RECONSIDERATION AND |
| _____ | ) | WITHDRAWING OPINION |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| SLOAN PATRICK STANLEY, | ) | |
| | ) | |
| Petitioner. | ) | |

The court has considered Sloan Stanley's pro se motion for reconsideration and the State's motion for reconsideration of this court's opinion filed on March 2, 2021, and is of the opinion that both motions should be denied. Therefore,

IT IS ORDERED that the State's motion for reconsideration and Mr. Stanley's pro se motion for reconsideration are hereby denied.

IT IS FURTHER ORDERED that the opinion filed on March 2, 2021, is hereby withdrawn and a new opinion (which adds a footnote on page 26) shall be filed this day.

PANEL: Judges Lawrence-Berrey, Pennell, and Siddoway

FOR THE COURT:

_____

REBECCA PENNELL
CHIEF JUDGE



**FILED**
**APRIL 15, 2021**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36432-1-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 37546-3-III) |
| | ) | |
| v. | ) | |
| | ) | |
| SLOAN PATRICK STANLEY, | ) | |
| | ) | |
| Appellant. | ) | UNPUBLISHED OPINION |
| In the Matter of the Personal Restraint of: | ) | |
| | ) | |
| | ) | |
| SLOAN PATRICK STANLEY, | ) | |
| | ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, J. — Sloan Stanley appeals his convictions of five counts of felony harassment and one count of intimidating a judge. He also appeals his exceptional sentence of 402 months, which was more than five times the mid-point of his standard range sentence.

Stanley raises several arguments on direct review, by way of a statement of additional grounds for review and by way of a personal restraint petition. Many of his arguments are made moot by our decision to reverse and remand for a new trial.

We conclude the trial court violated Stanley's constitutional right to present a defense by excluding highly relevant evidence despite the evidence having little or no ability to disrupt the fairness of the fact-finding process. Because sufficient evidence supported all of Stanley's convictions, we conclude that remand, not dismissal, is the appropriate remedy.

We exercise our discretion to address an issue raised on appeal that will have a significant impact on retrial. We conclude the trial court did not abuse its discretion by allowing four women to testify thoroughly about the reasonableness of their fear, including allowing them to read to the jury old e-mails that Stanley sent them.

Finally, we dismiss his personal restraint petition.

## BACKGROUND

In 2015, a jury found Stanley guilty of multiple counts of felony cyberstalking four women. King County Judge Jeffrey Ramsdell imposed a drug offender sentencing alternative (DOSA) sentence of 25 months and released Stanley on community supervision.[1] His conditions of supervision included seeking treatment, not using social media, and not contacting or attempting to contact any of the victims directly or

---

[1] At the time of sentencing, Stanley had already served 12.5 months.

2

indirectly. Within a few months, Stanley violated his DOSA by using Facebook to contact a bartender who worked with one of the victims.

While being transported to serve his sentence, Stanley met another inmate who recently violated his DOSA, Randy Burleson. Burleson and Stanley were celled together for 12 days. During that time, Stanley and Burleson talked about why their DOSAs were revoked. According to Burleson's later statements to investigators, Stanley was very angry with the criminal justice system and repeatedly threatened to kill several people involved in his 2015 trial.

About one year later, Detective Rande Christiansen of the Seattle Police Department learned that Burleson claimed Stanley had repeatedly threatened to kill several people involved in his 2015 trial. Detective Christiansen, who had been involved in the 2015 case, interviewed Burleson. Based on this interview, the State placed a confidential informant, Billy Temple, in Stanley's cell to see if he would continue making threats. Soon after, the State obtained an order allowing it to audio record the conversations in Stanley's cell.

Detective Christiansen, in the probable cause statement leading to the charges in this case, referred to several discussions he and other investigators had with Temple. In that statement, Temple said Stanley talked about his plans to "'get'" or "'handle'"

several persons involved in his 2015 case, talked about having a gun somewhere in

Mukilteo where he would soon be released, and said something to the effect of, "'Those

bitches should fear me,'" and "'I can't let [t]his go.'" Clerk's Papers (CP) at 2-3.

PROCEDURE

The State charged Stanley with seven counts of felony harassment and one count

of intimidating a judge. The State alleged the "egregious lack of remorse" aggravator

with respect to each of the four victims not associated with the criminal justice system,

and alleged the "retaliation of a public official's performance" of official duty aggravator

with respect to each of the public official victims.

Stanley promptly requested the audio surveillance from when he and Temple

shared a cell, believing it would exonerate him. Stanley initially received only 30 hours

of the recordings. He advised the court they contained nothing incriminating, proved his

innocence, and said if the remaining 144 hours of recordings contained incriminating

evidence, he was sure the State would have released them.

The State offered to resolve Stanley's case through a stipulated order of

continuance, meaning eventual dismissal of charges if Stanley complied with agreed

conditions. Stanley rejected the offer, electing for a trial to prove his innocence. The

charges were brought in King County, but Stanley moved to transfer venue to Walla

Walla County and to recuse the King County Prosecutor's Office (KCPO). Whether by court order or agreement, the case was transferred to Walla Walla County.

Walla Walla County appointed Gary Ernsdorff, a King County deputy prosecutor, to prosecute Stanley. Stanley again moved to recuse the KCPO from the case. The court denied the motion.

In July 2018, the court set a trial date of September 5-13, 2018. On August 22, the State disclosed its witness list and omitted Temple, its informant. The next day, Stanley disclosed his witness list and listed Temple. When the State asked what Temple would be called to testify about, Stanley directed the State to hour 22 of the surveillance recordings.

On August 24, the State informed Stanley it would seek to admit Stanley's e-mails to the four female victims from his 2015 trial. In response, Stanley moved to stipulate to the element of reasonable fear with respect to those four women, arguing that the old e-mails should be barred under ER 404(b). The State submitted a summary of the facts relevant to each of the victims' reasonable fear. It asked that each victim be able to testify to her history with Stanley, and explain the prior threats—including some of the threatening messages—that led to his 2015 convictions.

The court denied Stanley's motion, finding the evidence admissible under

ER 404(b) to prove the victims were reasonably afraid of Stanley's current charged

threats. Its findings and conclusions read, in part:

> The Court finds that this evidence of prior acts is relevant for the specific purpose of proving the reasonable fear of each of the charged victims.
> The Court finds that the information is relevant to prove a necessary element of the crimes for which the defendant has been charged.
> The Court conducted an ER 403 balancing test and finds that the probative value of the evidence is not substantially outweighed by its prejudicial effect. . . . [I]n balancing the two, the Court finds that the evidence is not unfairly prejudicial. In weighing the two, the Court found that it was more probative than prejudicial. The Court will also issue any requested limiting instruction to further mitigate any prejudicial effect.

CP at 96.

On September 5, the State filed an amended information. The new information

dismissed two charges of felony harassment and added a new felony harassment charge.

It included six counts of felony harassment—the four earlier asserted involving the

female victims in the 2015 trial, the one earlier asserted involving the King County

deputy prosecutor, and a new charge involving Judge Ramsdell. The seventh count

reiterated the prior intimidating a judge charge involving Judge Ramsdell.

TRIAL

*Randy Burleson's testimony*

Stanley told Burleson his DOSA was revoked when he tried to contact one of the

witnesses from his trial. Stanley was angry about the witnesses testifying against him.

He would grow agitated when talking about "how he wanted to kill these three girls, a

judge and a prosecutor." 2 Report of Proceedings (RP) (Sept. 10, 2018) at 215.

The State asked Burleson whether he had heard other inmates say they would like

to kill people. Burleson answered yes. Burleson could not always tell whether inmates

actually intended to do the things they said, but with Stanley he testified: "I feel without a

doubt that he meant every word he said." 2 RP (Sept. 10, 2018) at 216. When asked

what Stanley said about the women, the judge, and the prosecutor, Burleson answered,

"He wanted to fucking kill them. . . . That's his language." 2 RP (Sept. 10, 2018) at 217.

He said this multiple times throughout multiple days. Burleson described Stanley's

behavior as "craziness." 2 RP (Sept. 10, 2018) at 218.

When the State clarified whether Stanley talked about the women who testified

against him at his trial, Burleson said, "Yeah. There were three witnesses. And one—

one of the women witnesses is one that they—why they revoked his DOSA. . . . He

wanted to kill them." 2 RP (Sept. 10, 2018) at 218.

The State then asked Burleson about the prosecutor from Stanley's 2015 case:

> [THE STATE:]  So—And so what was the prosecutor doing with Mr. Stanley that made him mad at the prosecutor?
>
> [BURLESON:]  I think Stanley was quoting some—some law and they were kind of just, I think, overlooking it in his eyes because he wasn't a real attorney, I'm thinking.
>
> [THE STATE:]  And so did that make Mr. Stanley mad, what—
>
> [BURLESON:]  Yeah.
>
> [THE STATE:]  —what you could observe?
>
> [BURLESON:]  That made him very mad, yes.
>
> [THE STATE:]  What did he say he wanted to do to the prosecutor?
>
> [BURLESON:]  He wanted to kill him.
>
> [THE STATE:]  Did he describe how?
>
> [BURLESON:]  Well, there was a couple of times where he made a—a gesture on what he'd just like to kill him. . . .
>
> . . . .
>
> [BURLESON:]  A shooting stance, yes.

2 RP (Sept. 10, 2018) at 223.  Stanley talked about a specific gun he owned that his grandfather made.  Burleson said Stanley made at least 20 threats in the 12 days they were in the same cell.  He did not mind being housed with Stanley at first, but he became more and more uncomfortable as Stanley's anger intensified.  He described how Stanley seemed unstable and would go from 0 to 100 and back down.  When asked whether he had ever felt like that before, Burleson said he had not.  Burleson described how Stanley seemed to feel it was his "destiny" to kill the witnesses, judge, and prosecutor and that he felt "justified" and would have "his final satisfaction" in doing so.  2 RP (Sept. 10, 2018) at 230.

8

On cross-examination, the defense pressed Burleson on whether he knew anything more specific about the women Stanley allegedly threatened. Burleson stated he did not know much about Stanley's prior case. Burleson admitted that he committed numerous crimes in his life, some of which involved dishonesty. He said people who commit crimes are deceitful in some way, but that he was there testifying "because of what [Stanley] said." 2 RP (Sept. 10, 2018) at 237-38.

### *Prosecutor Wesley Brenner's testimony*

The State called Wesley Brenner, the King County deputy prosecuting attorney who tried Stanley's 2015 case. Brenner testified to his experience in the prosecutor's office working with violent crimes, juvenile matters, domestic violence, and stalking. Brenner discussed how he was assigned to the case, and that he was "probably the first attorney to realize the scope of what had been done." 2 RP (Sept. 10, 2018) at 299-300. Brenner knew Stanley from the trial and had spoken with him on the phone after Stanley decided to represent himself. When Brenner learned of the threats he said, "I was shocked and I was afraid." 2 RP (Sept. 10, 2018) at 302. Brenner had been threatened by defendants before, but Stanley's threats were different in his mind because they sounded more like a plan. He explained:

> But I think the biggest reason was just because of the previous interactions I had with Mr. Stanley. The rage that I had seen him show toward the victims, towards the judge, towards myself. The obsessive behavior that I had seen him exhibit over four years of constant emails and Facebook messages to the women involved.
>
> And, yeah, just the ideation of violence and suicidal behavior that he described in his—in his—in those messages.

2 RP (Sept. 10, 2018) at 304. Brenner was concerned that Stanley had taken steps to find out the witnesses had moved, when their purpose for doing so was "to have some distance from this." 2 RP (Sept. 10, 2018) at 306. To Brenner, the threat "sounded believable because it was similar things that [Stanley] had said before in the past." 2 RP (Sept. 10, 2018) at 306. Defense counsel objected on grounds of relevancy, which the court overruled. Brenner also knew Stanley was originally from Idaho, he was concerned about losing his right to possess a firearm during his last trial, and he may have access to firearms in Idaho. Brenner noted that Stanley's behavior leading up to his trial "had been getting progressively worse" and "it sounded like there was a good chance he was going to take these steps to come after me and the other victims." 2 RP (Sept. 10, 2018) at 308.

Brenner described his relationship with Stanley as "very professional" until they disagreed about something. 2 RP (Sept. 10, 2018) at 309. Then "it would be like a light switch. . . . [J]ust an outburst of temper. He'd start yelling at me. Often he'd . . . scream at me and hang up the phone. . . . He called the women liars and a lot of worse things

10

than that as well." 2 RP (Sept. 10, 2018) at 309. Brenner then gave examples of the language Stanley used.

Brenner explained that after Stanley's sentencing he monitored Stanley because he was "concerned about what he might do when—when he was released even before I heard the threats." 2 RP (Sept. 10, 2018) at 315. Brenner had not done that before. After he learned of Stanley's revocation and subsequent threats from jail, he shopped for a home security system and left the criminal section of the prosecutor's office.

On cross-examination, Brenner acknowledged that Stanley had never threatened him nor had Stanley directly contacted him since the 2015 trial. He only learned of Stanley's threats from Detective Christiansen.

*2015 cyberstalking victims' testimonies*

Alyson Gray, Miriam Much, Elizabeth Bell,[2] and Leah Mesford, the victims of Stanley's 2015 cyberstalking convictions, testified at trial. Before they testified, Stanley again offered to stipulate to their reasonable fear. He argued the testimony would amount to a retrial of his prior convictions and would prejudicially influence the jury. The State argued the testimony about Stanley's prior conduct was relevant to the "reasonable fear"

---

[2] Ms. Bell married and changed her surname following the 2015 trial. In that proceeding she was Elizabeth Williams.

element in his felony harassment charges. The court denied Stanley's offer, allowing the victims' testimony and admitting the messages into evidence that formed the basis of the 2015 trial.

The women testified they met Stanley at a local bar around 2010 where one of them worked as a bartender. They were not friends with Stanley, had not exchanged contact information, and had never made plans to meet him at the bar or elsewhere. The State asked them to describe, in detail, what they remembered about the messages that resulted in Stanley's cyberstalking convictions. Ms. Gray remembered, "He . . . wrote things like painting with my blood on the walls and, you know, hunting us down . . . ." 2 RP (Sept. 10, 2018) at 253. She said, "I just did my best to wipe myself off of the Internet so he hopefully couldn't find me" because "I felt like my life was in danger." 2 RP (Sept. 10, 2018) at 253-54. She described some of the e-mails as "rambling" or "professing, like, love and romantic and sexual interests" but "most of them were threatening." 2 RP (Sept. 10, 2018) at 263. Ms. Much said, "I will never forget him saying that the blood will spill from the bitches who have wronged him," and that "he's never going to give it up." 3 RP (Sept. 11, 2018) at 426-27. Ms. Bell remembered: "All of the messages about, I hope you die or I hope someone shoots you are haunting." 3 RP (Sept. 12, 2018) at 498. Ms. Mesford said the messages were "too scary to read and let

sink in" and that she tried to "disassociate with it because it's so severe it's hard for me to process the content." 3 RP (Sept. 12, 2018) at 530.

The prosecutor asked each victim to read aloud several of the most violent messages they received from Stanley. Ms. Gray read from seven separate messages where Stanley said things like, "I will fucking kill you, you worthless, fucking whore." 2 RP (Sept. 10, 2018) at 265. Each of the other victims read aloud to the jury several similarly violent, threatening, and offensive messages. Copies of these messages were also admitted into evidence.

The State asked the victims about the fear Stanley instilled in them, including what steps they each took to protect themselves. It also asked how they reacted when they heard about Stanley's alleged threats from prison. Ms. Gray testified that her fear had never decreased: "In a way I'm even more nervous because obviously his fixation and his obsession has continued." 2 RP (Sept. 10, 2018) at 268. She was not surprised Stanley had been making threats from prison, because "[t]hose were the messages that he engrained in my memory over years and years and years and that was the same language I had come to expect from him." 2 RP (Sept. 10, 2018) at 270. The following exchange took place:

[THE STATE:]  Is there anything that struck you about the language?

[MS. GRAY:]  The fact that he said he had hidden a gun and that he was planning to find us and kill us.

I mean, it was along the same lines of what he had sent me before and—Yes, I was familiar with the kind of language he had used in the past and it sounded along those same lines.

[THE STATE:]  From your experience it sounded like the words Mr. Stanley would use?

[MS. GRAY:]  Yes.

[THE STATE:]  Do you believe those words?

[MS. GRAY:]  I—I mean, yeah.  I'm—I'm—Sadly, that is the kind of language that I expect from him.  Those are the same kinds of threats he would use towards me repeatedly.

2 RP (Sept. 10, 2018) at 272.  The State asked Ms. Bell whether the recent threats were "similar to things he said" in the past, and Ms. Bell answered, "Very, but years later."

3 RP (Sept. 12, 2018) at 509.  Ms. Mesford said she was afraid when she heard about the threats "[b]ecause like I said, I knew in my heart that he wasn't going to let this go and that just proved to me that my thoughts were right."  3 RP (Sept. 12, 2018) at 525.  The defense objected to the prior case being brought up, which the court overruled.  Ms. Mesford continued: "I was a little bit afraid to be back in my home state . . . [b]ecause he's unpredictable and he has not made any moves to let go of harassing and threatening me and my life."  3 RP (Sept. 12, 2018) at 528.

On cross-examination, the defense asked the victims to read other messages from Stanley, where he expressed sadness, suicidal thoughts, and asked for help or clarity.

14

Ms. Gray read one message where Stanley asked: "How much pain do you want to cause

me?" and "Why can't you do something?" 2 RP (Sept. 10, 2018) at 281-82. Ms. Bell

acknowledged that his talk of self-harm "kind of pulled on my heart strings of feeling bad

for him, while simultaneously being scared of him that he seems really mentally

unstable." 3 RP (Sept. 12, 2018) at 510. None of the women had been contacted by

Stanley at any time following the 2015 trial. They learned of the prison threats from

Detective Christiansen.

### *Detective Christiansen's testimony*

Detective Christiansen described the events leading up to the current charges.

After Stanley was back in jail, Christiansen received "[i]nformation that was passed along

from various agencies to myself that Mr. Stanley was making threats again towards the

women." 2 RP (Sept. 10, 2018) at 339. This information came from Burleson, who

Christiansen then interviewed. Following the interview, the State placed a recording

device and an informant, Billy Temple, in Stanley's cell. When the State asked

Christiansen what was on the recording, the defense objected: "The jury is going to hear

that recording."[3] 2 RP (Sept. 10, 2018) at 347. The State rephrased, and the following

---

[3] As explained below, the jury did not hear the recording. Christiansen's testimony
is all the information the jury received about the time Stanley and Temple were celled
together.

exchange took place:

> [THE STATE:]  The parts you listened to, did you hear any threats made by Mr. Stanley?
> [CHRISTIANSEN:]  No.
> [THE STATE:]  Did you hear any conversation that was of interest to your investigation or any statements made by Mr. Stanley that were of interest to your investigation?
> [CHRISTIANSEN:]  Yes.
> [THE STATE:]  What was that?
> [CHRISTIANSEN:]  He talked about his firearm, that when he gets out.  He talked about that he was very angry with the system, wanted to get back at, you know, them.  His quote was, I want to handle them.  He was talking about the—the judge and everybody.
> [THE STATE:]  But no—no threats of bodily harm to them?
> [CHRISTIANSEN:]  No.

2 RP (Sept. 10, 2018) at 347.  Christiansen also said the tape contained conversations about Stanley's grandfather's gun, but no specifics were mentioned.

On cross-examination, the defense asked whether the informant was placed because of Burleson's "distinct lack of credibility."  2 RP (Sept. 10, 2018) at 357. Christiansen said he found Burleson very credible.  On redirect, Christiansen elaborated about Burleson:

> So listening to him, his story—like I said, I didn't have preconceived ideas about him, but him coming forward and me asking him basically, what do you want out of this?  Nothing.  You know, doesn't want money, doesn't want good time behavior, doesn't want anything.  He said he had only a few more months to be in prison and basically said he could—he was so used to it, it doesn't make a difference to get out any earlier type of thing.  He

16

> didn't want anything.  He just wanted these people not be killed.  I felt that was why he was very credible when I talked to him.

2 RP (Sept. 10, 2018) at 360.  On recross-examination, the defense asked Christiansen whether the affidavit he submitted with the prosecutor's office was based on Burleson's distinct lack of credibility, to which Christiansen said yes.  He explained: "There would be questions whether a person that's been in prison is always going to tell the truth later on."  2 RP (Sept. 10, 2018) at 363.

### *Exclusion of Billy Temple's testimony*

During trial, the State notified Stanley it would object to the testimonies of Temple and Brian Delano, an inmate acquaintance of Stanley's.  Stanley promptly brought the issue before the trial court, and the parties debated the admissibility and relevancy of Delano's and Temple's testimonies.

The trial court asked Stanley the purpose of Delano's and Temple's testimonies. Stanley explained the purpose was to rebut Burleson's testimony that he repeatedly threatened to kill the persons involved in his 2015 trial.  Burleson's testimony had spanned a 12-day period when he and Stanley had shared a cell.  Delano would testify that he spent a lot of time with Stanley around that same time and never heard Stanley threaten anyone.  Instead, Delano would testify that Stanley was frustrated that he did not get a fair trial and was focused on his appeal.  Temple, who spent about one week in a

17

cell with Stanley one year later, would testify similarly. That is, Temple would testify

that Stanley did not make threats against the prior trial participants, but instead felt he did

not get a fair trial and was focused on his appeal. Stanley asserted that his statements to

Temple were particularly important to his defense because they could be verified—

they were recorded (unbeknownst to him) by the State. Stanley argued that his statements

to Delano and Temple were admissible under ER 803(a)(3) to show his "then existing

state of mind . . . such as intent, plan, motive, design, [and] mental feeling." 3 RP

(Sept. 11, 2018) at 460.

The State argued that the statements constituted self-serving hearsay. It especially

objected to Stanley's statements to Temple, which it argued were irrelevant because they

were made too long after Stanley's statements (to Burleson) that formed the bases of the

State's charges.

Stanley had a two-fold response. First, his later statements to Temple showed his

intent closer to the time when he would be released. Second, he emphasized that his

statements to Delano and Temple were consistent and if the jury believed he made these

harmless statements, this significantly undercut Burleson's testimony.

The trial court permitted Delano to testify but not Temple. With respect to

Temple, the trial court described the statements as "self-serving hearsay, which was one

year post Mr. Burleson's statements . . . not under the stress or the excitement . . . after the incident." 3 RP (Sept. 12, 2018) at 480.

### *Delano's testimony*

Delano testified he knew Stanley and Burleson from their time in the Washington State Corrections Center. Burleson introduced Stanley to Delano out on the yard, which was a form of vouching for him. The defense asked Delano whether Stanley ever exhibited threatening outbursts when they were together, and Delano said no. Delano and Stanley were friends who exercised, went to the chapel service, and walked the yard together. Delano said Stanley did not frequently talk about his case, but he knew Stanley felt the system had let him down. Delano explained, "one of the reasons I liked to hang out with Mr. Stanley is because the conversation wasn't normal prison conversation, which is discussing cases, discussing who you are going to victimize next, discussing . . . how you are going to get over on the system." 3 RP (Sept. 12, 2018) at 589. Delano said Stanley did not act irrationally and, if he had, Delano would not have wanted to get to know him.

### *Stanley's testimony*

Stanley explained he was upset that his DOSA was revoked for his first violation because he knew other people who had many more violations without revocation. He

talked to Burleson about that and how he was mad at the hearings officers. Stanley also told Burleson about his life: where he was from, his mother, and his grandfather. Stanley was upset with the overall procedure of his 2015 trial and felt evidence had been unfairly excluded. When the State asked whether he was upset with the prosecutor, Stanley said: "Not him himself, no." 4 RP (Sept. 12, 2018) at 621. He explained, "I don't think it was fair. It's not like I had anything against him. I know he's doing his job. He's trying to win." 4 RP (Sept. 12, 2018) at 621. He said he disagreed with Judge Ramsdell on some of his rulings, and although they "battled" and "butted heads" in the courtroom, he respected him. 4 RP (Sept. 12, 2018) at 621-22. He also said no single witness in his 2015 trial was "central." 4 RP (Sept. 12, 2018) at 624.

### *State's closing argument*

The State reiterated how terrified the women, Brenner, and Judge Ramsdell were when they learned of Stanley's threats. It discussed Burleson's testimony: "One guy made him believe that he would make good on the idle threats that you hear in prison, one guy, Sloan Stanley." 4 RP (Sept. 13, 2018) at 671. The State emphasized how Burleson broke the convict code to testify against Stanley, when breaking the code "could be dangerous, it could be deadly." 4 RP (Sept. 13, 2018) at 672. It reiterated that Burleson

20

got no benefit, and "he came in here at his own personal peril." 4 RP (Sept. 13, 2018) at

673. The State then talked about the credibility of the threats:

> [THE STATE]: . . . When [the victims] heard the threats, why were they afraid? Because the words sounded like Mr. Stanley. They sounded like things—
>
> [THE DEFENSE]: And, your Honor—
>
> [THE STATE]: —they heard before.
>
> [THE DEFENSE]: —I'm going to object here. The State—the State is moving to essentially not follow the law in this portion of the statement. The jury has a limiting instruction saying that what was admitted from the prior trial only goes to the issue of reasonable fear, not to a propensity to convict of this crime.
>
> [THE STATE]: Part of their reasonable fear, they told you their reasonable fear was based on the consistency of the language in the current threats. They heard in those threats many of the things they heard before and it made them afraid. Every one of them came in and told you about how those threats rang true to them and made them—gave them that reasonable fear.
>
> Mr. Burleson, if he was making up threats, could have said a lot of things, but what he said, made them reasonably afraid.
>
> You can put your confidence, when you do the analysis of Randy Burleson's credibility . . . when you look at what he said and how it was corroborated by the other witnesses, you will know that it wasn't ninety-five percent true. What he said that without motivation, without really knowing this person, without getting anything, without having a motive to lie against Mr. Stanley, without having any other motivation except trying to do the right thing, trying to prevent a tragedy, you will know you can trust a hundred percent, not just the ninety-five.

4 RP (Sept. 13, 2018) at 676-77.

*Jury verdict, posttrial motions, and sentencing*

On September 13, 2018, the jury found Stanley guilty of six counts of felony harassment and one count of intimidating a judge. It also found Stanley demonstrated an egregious lack of remorse in the conduct constituting counts 1 through 4 of felony harassment. It further found Stanley committed felony harassment against the prosecutor and intimidated the judge in retaliation for their performance as officers of the court. The State requested an exceptional sentence based on the jury's findings of these aggravating factors.

On September 20, 2018, Stanley filed five pro se motions with the court. He moved to dismiss count 7, intimidating a judge, for lack of evidence. He also requested a new trial, asked the court to overrule the judgment notwithstanding the verdict, and sought dismissal pursuant to CrR 8.3. Stanley submitted a letter to a different prosecutor alleging—among other things—the State's witnesses committed perjury during his trial and asked the State to prosecute them. On October 15, 2018, Stanley requested the court compel his attorney to help with his five motions. On October 31, 2018, he filed another motion to dismiss count 7 and aggravating factors for counts 5 and 6. The State responded that Stanley's motions were meritless and should be denied.

The court set a hearing on Stanley's motions for November 7, 2018. At the hearing, the court vacated count 6 on grounds of double jeopardy. It then imposed an exceptional sentence of 60 months on counts 1 through 5 and 102 months on count 7, running consecutive, for a total term of 402 months of incarceration.

Stanley appealed and later filed a personal restraint petition.

## ANALYSIS

A.    FAIR TRIAL RIGHT TO PRESENT A DEFENSE

Stanley contends the trial court violated his constitutional right to present a defense by prohibiting him from calling Billy Temple as a witness and excluding the audio surveillance from when he and Temple shared a cell. We agree.

The right of the accused to defend against the State's accusations is guaranteed by the federal and state constitutions. U.S. CONST. amend. VI, XIV; CONST. art. I, §§ 3, 22; *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). The right to present a defense is "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

We apply a two-step review to a defendant's claim that an evidentiary ruling violated his or her right to present a defense under the Sixth Amendment to the United

States Constitution. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). We review the trial court's evidentiary ruling for abuse of discretion. *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017). Then, "[i]f the court excluded relevant defense evidence, we determine as a matter of law whether the exclusion violated the constitutional right to present a defense." *Id.* at 648-49.

*The trial court abused its discretion by misapplying the law*

At trial, Stanley argued his statements were admissible under ER 803(a)(3). Under that rule, a declarant's then existing mental state is not hearsay and is admissible to show intent or plan.

The State sought to establish that Stanley intended or planned to harm or kill six different persons. It did this through one witness—Burleson. Stanley sought to rebut Burleson's testimony by establishing that Burleson was lying and that Stanley never intended or planned to harm or kill the prior trial participants. He wanted to do this through two witnesses. The first witness, Delano, spent time with Stanley during the same time Burleson did. Delano testified that Stanley did not believe he received a fair trial but was not bitter toward any participant. The second witness, Temple, spent one week with Stanley one year later. Temple's testimony would be similar to Delano's. The obvious advantage of calling Temple was that he was the *State's* informant. In addition,

24

Temple prodded Stanley about his 2015 trial, yet Stanley—not knowing his conversations were being recorded—did not make threats against persons involved in that trial. The fact that Temple's testimony would be similar to Delano's served to bolster Delano's testimony and undermine Burleson's.

In addition, if the jury believed both Burleson and Temple, it might find that the fear of the alleged victims was not reasonable. When Stanley made his statements to Burleson, Stanley was several months from release and posed no immediate threat to the alleged victims. If the jury heard the later audio recordings and believed that Stanley, nearing the time of his release, had resolved to address his concerns through an appeal rather than through violence, the jury might acquit Stanley. Defense counsel hinted at this when she argued that Stanley's state of mind as he neared release was highly relevant.

A trial court abuses its discretion by misapplying the law. *State v. Pavlik*, 165 Wn. App. 645, 650-51, 268 P.3d 986 (2011). Here, the trial court abused its discretion by focusing on the wrong hearsay exception—excited utterance.

*The error violated Stanley's right to a fair trial*

The right to present a defense is intended to ensure "fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302. This includes the

right to present the defendant's version of the facts. *Taylor v. Illinois*, 484 U.S. 400,

408-09, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

If evidence proffered by the defense is relevant, "the burden is on the State to

show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at

trial." *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002). Below and on appeal,

the State has not argued the proffered evidence would disrupt the trial process. Rather, it

argued and still argues that the evidence was not relevant. As explained above, we

disagree. It was very relevant to Stanley's defense.[4]

Where the right to present a defense is not absolutely denied, such as here, we will

not reverse if the State proves the error was harmless beyond a reasonable doubt. *State v.*

*Coristine*, 177 Wn.2d 370, 380 n.1, 300 P.3d 400 (2013). The State argues this standard

is met because Detective Christiansen testified about Stanley's statements to Temple.

The detective said that he reviewed some of the recordings. He testified,

somewhat inconsistently, that Stanley threatened to get certain persons and spoke about a

---

[4] In addition to the reasons discussed above for why Temple's testimony would be relevant, the State opened the door to Temple testifying. It did this by having Detective Christiansen testify that Stanley told Temple he would get a gun and "handle them," referring to the judge and everybody. 2 RP (Sept. 10, 2018) at 347; *see State v. Jones*, 144 Wn. App. 284, 298, 183 P.3d 307 (2008) (irrelevant evidence may be made relevant when the other party opens the door to it).

gun, yet he did not physically threaten anyone. This ambiguous testimony significantly differed from how Temple would testify. According to Stanley's offer of proof, Temple would testify that Stanley did not threaten the 2015 trial participants. We conclude that the trial court's error was not harmless beyond a reasonable doubt.

B.      SUFFICIENCY OF EVIDENCE CHALLENGES

Stanley challenges the sufficiency of the evidence by raising two arguments that implicate core First Amendment rights. If, on appeal, he wins these arguments, constitutional double jeopardy principles require these charges to be dismissed rather than retried. *State v. Hardesty*, 129 Wn.2d 303, 309, 915 P.2d 1080 (1996). We, therefore, must review these arguments.

For a challenge to the sufficiency of the evidence that implicates core First Amendment rights, it is not enough to engage in the usual process of assessing whether there is sufficient evidence in the record to support the verdict. *State v. Kilburn*, 151 Wn.2d 36, 49, 84 P.3d 1215 (2004). Rather, the "rule of independent review" requires an appellate court to freshly examine "crucial facts" that bear on the constitutional question. *Id.* at 52.

*Felony harassment*

Stanley contends the State produced insufficient evidence that the alleged threats were made against all four female victims from the 2015 trial. He argues Burleson's allegations and testimony were too vague to support the four convictions under the felony harassment statute. We disagree.

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A sufficiency of the evidence challenge admits the truth of the State's evidence and all reasonable inferences drawn therefrom. *Id.* "Circumstantial evidence and direct evidence carry equal weight when reviewed by an appellate court." *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.3d 474 (2016). We defer to the fact finder on credibility issues, conflicting testimony, and persuasiveness of the evidence. *State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200 (2015).

A person is guilty of harassment if "the person knowingly threatens . . . [t]o cause bodily injury immediately or in the future to the person threatened . . . [and] . . . [t]he person by words or conduct places the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(a)(i), (b). This statute criminalizes pure speech

28

and therefore must comport with the First Amendment. *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969). However, certain categories of speech, such as "true threats," are not protected by the First Amendment. *Kilburn*, 151 Wn.2d at 43; *State v. Williams*, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001). The harassment statute prohibits true threats. *Williams*, 144 Wn.2d at 208.

When determining whether the speech is a "true threat," we conduct an independent review of the record "'so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Kilburn*, 151 Wn.2d at 50 (internal quotation marks omitted) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 508, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)). This so-called rule of independent review "is limited to review of those 'crucial' facts that necessarily involve the legal determination whether the speech is unprotected." *Id.* at 52.

Stanley argues the rule of independent review applies here because his sufficiency challenge implicates the First Amendment. Although the harassment statute criminalizes pure speech, Stanley does not argue his threats were not "true threats." Instead, he argues the State brought insufficient evidence supporting the *identity* of the victims. The heightened standard does not apply because we are not examining whether the speech was

29

unprotected.  As stated earlier, we review the evidence in the light most favorable to the

State and accept the State's evidence as true.  *Salinas*, 119 Wn.2d at 201.

The State's evidence supports felony harassment convictions against all four of the

female victims from the 2015 trial.  Burleson testified that Stanley threatened *three*

*women*, the judge, and the prosecutor from his prior trial.  Yet Burleson never testified

which three and the inference was that Stanley harbored hate toward all of the women

who had testified against him.  All four women who were victims in the 2015 trial also

testified at the present trial.  Viewing the evidence and all inferences in the light most

favorable to the State, a jury could reasonably find that Burleson meant all female victims

and mistakenly believed there were three rather than four of them.  We conclude the State

presented sufficient evidence to sustain all five felony harassment verdicts.

*Intimidating a Judge*

Stanley argues his intimidating a judge conviction cannot stand because the statute

criminalizes pure speech without a scienter requirement in violation of the First and

Fourteenth Amendments.  We disagree.

RCW 9A.72.160(1) provides: "A person is guilty of intimidating a judge if a

person directs a threat to a judge because of a ruling or decision of the judge in any

official proceeding."  Under RCW 9A.04.110(28)(a), "threat" means "[t]o communicate,

directly or indirectly, the intent . . . [t]o cause bodily injury in the future to the person threatened or to any other person." *See also* RCW 9A.72.160(2)(b).[5] As discussed above, "true threats" are not protected by the First Amendment. *Kilburn*, 151 Wn.2d at 43. "A true threat is a serious threat, not one said in jest, idle talk, or political argument." *Id.* We determine whether speech is a true threat "'in light of the entire context,'" asking "'whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat or a joke.'" *Trey M.*, 186 Wn.2d at 894 (quoting *Kilburn*, 151 Wn.2d at 46).

Stanley argues the State is required to show his subjective intent to threaten under *Elonis v. United States*, 575 U.S. 723, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015). In *Elonis*, the defendant was charged under a federal statute criminalizing "'any communication containing any threat . . . to injure the person of another.'" 135 S. Ct. at 2004 (quoting 18 U.S.C. § 875(c)). Elonis challenged his conviction, arguing the jury should have been required to find he intended his communications to be threats. *Id.* at 2007. The Supreme Court explained: "Federal criminal statutes that are silent on the required mental state should be read to include 'only that *mens rea* which is necessary to separate' wrongful

---

[5] RCW 9A.04.110 has been amended several times. Subsection (28)(a), not (25), now contains the definition of "threat."

from innocent conduct." *Id.* at 2003 (quoting *Carter v. United States*, 530 U.S. 255, 269, 120 S. Ct. 2159, 147 L. Ed. 2d 203 (2000)). The court reasoned, "[h]aving liability turn on whether a 'reasonable person' regards the communication as a threat—regardless of what the defendant thinks—'reduces culpability on the all-important element of the crime to negligence.'" *Id.* at 2011 (quoting *United States v. Jeffries*, 692 F.3d 473, 484 (6th Cir. 2012) (Sutton, J., dubitante)).

Our Supreme Court rejected the argument that *Elonis* requires abandoning Washington's objective-person standard. *Trey M.*, 186 Wn.2d at 908. Trey M. was convicted of felony harassment, which requires the defendant "'knowingly threatens,'" or "'subjectively know[s] that he or she is communicating a threat.'" *Id.* at 895 (quoting RCW 9A.46.020(1)(a); *State v. J.M.*, 144 Wn.2d 472, 481, 28 P.3d 720 (2001)). Thus, unlike the federal statute in *Elonis*, Washington's harassment statute has a mens rea requirement. *Id.* at 897-98. *Elonis* turned on statutory construction—not the First Amendment—and was limited to the federal statute it addressed. *Id.* at 896. Therefore, *Elonis* did not control and the court declined to abandon its established First Amendment precedent.

Stanley distinguishes *Trey M.*, arguing RCW 9A.72.160 contains no mens rea requirement and therefore *Elonis* requires us to read one in. He argues that under *Trey*

32

*M.*, "the lack of a *mens rea* in the intimidating a judge statute creates the 'gap' *Elonis* requires to be filled." Am. Br. of Appellant at 31. We disagree. "Importantly, *Elonis* did not mandate a scienter requirement for all offenses. Rather, *Elonis* creates a gap-filling rule that stands for the 'presumption' of a scienter requirement when the federal offense is otherwise silent." *Trey M.*, 186 Wn.2d at 897 (internal quotation marks omitted) (quoting *Elonis*, 135 S. Ct. at 2010-11). *Elonis* was a federal statutory construction case; the court did not consider First Amendment issues. 135 S. Ct. at 2012. Thus, Stanley's argument that *Elonis* and the First Amendment require us to read a mens rea requirement into RCW 9A.72.160(1) fails.

We do, however, find the statute already requires an element of conscious wrongdoing by the speaker. The threat must be communicated *because of* an official ruling by the judge threatened. Thus, the statute does not criminalize "idle talk" or "political argument." We agree this statute implies a mens rea requirement above negligence and is therefore consistent with "'the conventional requirement for criminal conduct—*awareness* of some wrongdoing.'" *Elonis*, 135 S. Ct. at 2011 (quoting *Staples v. United States*, 511 U.S. 600, 606-07, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994)). For these reasons, we reject Stanley's sufficiency challenge.

C. EVIDENTIARY ISSUE THAT WILL OCCUR ON REMAND

In the interest of judicial economy, an appellate court may address an issue that is likely to occur following remand if the parties have briefed and argued the issue in detail. *Philadelphia II v. Gregoire*, 128 Wn.2d 707, 716, 911 P.2d 389 (1996). We exercise our discretion and address a central evidentiary issue that will occur on remand and do so to foreclose a future appeal on that issue.

Stanley argues the trial court violated ER 404(b) and ER 403 by allowing the State to introduce evidence of his conduct toward the female victims in his 2015 trial because it was propensity evidence. He further argues the court erred by allowing the e-mails from his 2015 trial to be admitted as substantive evidence. We address each argument in turn.

ER 404(b) bars the admission of evidence of prior bad acts for the purpose of proving a person's character and showing the person acted in conformity with that character. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). This rule seeks to prevent a defendant from being convicted for misconduct not at issue. *See Williams v. New York*, 337 U.S. 241, 247, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949). Evidence of prior bad acts may, however, "'be admissible for any other purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice.'" *Gunderson*, 181 Wn.2d at 922 (quoting *State v. Gresham*, 173 Wn.2d 405,

420, 269 P.3d 207 (2012)). When determining whether prior bad acts are admissible, the

trial court considers the purpose for which the evidence is sought, its relevancy to an

element of the crime charged, and whether its probative value outweighs the danger of

unfair prejudice. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). In other

words, ER 404(b) implicates ER 403. *Gunderson*, 181 Wn.2d at 923. We review

ER 403 rulings for abuse of discretion. *State v. Taylor*, 193 Wn.2d 691, 697, 444 P.3d

1194 (2019). "A trial court abuses its discretion when its decision is manifestly

unreasonable or is based on untenable grounds or reasons." *Id.*

In harassment cases, evidence that the victim knew of the defendant's past violent

acts is admissible to prove the victim's reasonable fear. *See State v. Ragin*, 94 Wn. App.

407, 411-12, 972 P.2d 519 (1999). The prior conduct permits the trier of fact to

understand the context and better evaluate the reasonableness of the victim's fear.

*See id.* at 411 ("If the jury were presented with evidence of [the current threats] alone, it

may have believed [the victim] was overreacting."). This reasoning applies here. The

details of the old e-mails were highly relevant so a jury could assess the reasonableness

of each of the four women's fear upon hearing the prison threats. The greater the fear

reasonably caused by the old e-mails, the more likely a prison threat would induce

reasonable fear that Stanley would carry out the threat once freed.

*Propensity evidence*

Stanley argues the trial court erred in allowing the State to intentionally elicit propensity evidence from its witnesses.  He points to several moments where the State compared Stanley's 2015 conduct to the current conduct over defense's objections.  For example, the State asked Brenner if there was "anything about the . . . alleged threats . . . that didn't sound concerning or accurate?"  2 RP (Sept. 10, 2018) at 306.  Brenner responded, "it sounded believable because it was similar things that he had said before in the past."  2 RP (Sept. 10, 2018) at 306.  Although the State chose to ask whether the threats seemed "accurate," which did elicit a comparison, the question is clearly directed at understanding Brenner's fear.

The State asked Judge Ramsdell if there was anything "that made you believe that Stanley would continue his behavior even after conviction?"  2 RP (Sept. 11, 2018) at 395.  The court overruled defense's propensity objection.  The judge answered, "I could only assume that if he doesn't understand what's wrong, he's probably not going to change that behavior."  2 RP (Sept. 11, 2018) at 396.  The State continued, "Did that make his threats more real, more concerning, more fearful to you?"  2 RP (Sept. 11, 2018) at 396.  The judge said, "Yes, in short."  2 RP (Sept. 11, 2018) at 396.  While the State could have been more careful about eliciting propensity evidence, this line of questioning

also spoke directly to Judge Ramsdell's reasonable fear that Stanley would carry out his current threats.

Stanley points to several instances where the victims compared Stanley's prior threats to the current threats during testimony. In those instances, the victims described how Stanley's language in the current threats was similar to his prior threats. The State sought to elicit testimony that the victims' fear was reasonable because Stanley continued acting in a frightening way. Again, the victims' history with Stanley places the threats in context and allows the trier of fact to determine whether their fear was reasonable. The court properly instructed the jury to consider the evidence for the sole purpose of determining whether "the alleged victims could have reasonable fear if the alleged threats were made." CP at 108. We presume the jurors followed the court's instructions. *Diaz v. State*, 175 Wn.2d 457, 474, 285 P.3d 873 (2012).

*Substantive evidence*

Stanley next contends the trial court erred by admitting the messages from 2015 as substantive evidence. Stanley argued the messages should only be permitted to refresh the witnesses' recollection, but the court disagreed. The witnesses read many of the most offensive messages aloud before they were admitted into evidence. Stanley argues the

probative value of these messages was outweighed by their prejudicial effect. We

disagree.

A danger of unfair prejudice exists "'[w]hen evidence is likely to stimulate an

emotional response rather than a rational decision . . . .'" *State v. Beadle*, 173 Wn.2d 97,

120, 265 P.3d 863 (2011) (quoting *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615

(1995)). Here, the messages, although graphic, were both highly relevant and potentially

unfairly prejudicial. Just as Stanley was entitled to present his best case by having his

best evidence considered by the jury, the State also was entitled to have its best interest

considered. Our conclusion might be different but for the fact that the details of these

e-mails were highly relevant for the State to meet its burden of proof.

*Stipulation*

Finally, Stanley mentions several times that he offered to stipulate to the element

of reasonable fear. "A 'stipulation' is an express waiver that concedes, for purposes of

trial, the truth of some alleged fact, with the effect that one party need offer no evidence

to prove it and the other is not allowed to disprove it." *State v. Case*, 187 Wn.2d 85, 90,

384 P.3d 1140 (2016). The State is generally not required to accept a defendant's

stipulation to an element of the charged crime nor is it precluded from offering evidence

on the issue merely because a defendant offers to stipulate. *Taylor*, 193 Wn.2d at 697.

However, when unfair prejudice substantially outweighs the proffered evidence's relevance, ER 403 requires the State to accept the stipulation and the trial court to exclude the proffered evidence. *Id.*

Stanley argued the admission of prior messages would result in a retrial of his previous case and would unfairly prejudice the jury as to the only disputed element at trial—whether the threats were made. Stanley argues that in denying his motion to stipulate, the element of reasonable fear was explored at length and resulted in the comparison of his current charges to his prior conduct. Our Supreme Court addressed a similar issue in *Taylor* and held the defendant's no-contact order admissible in his trial for a felony violation of that order. The court held the trial court did not abuse its discretion or violate ER 403 because the order was closely related to the current charges and is evidence of multiple elements of that offense. *Id.* at 693-94. Here, Stanley's charges were elevated to felony harassment in part because of his prior threats to the victims. Surely this evidence was prejudicial to Stanley, but the victims' testimony was evidence of an element of his current charged offenses. The trial court did not err in denying his motion to stipulate.

D.      PERSONAL RESTRAINT PETITION

Stanley raises three issues by way of personal restraint petition (PRP).

He first argues the State violated his due process rights by eliciting false testimony from Burleson and by giving false impressions to the jury multiple times. For the reasons noted in the State's response, these arguments are unpersuasive. Regardless, the relief he would be entitled to is the same relief we have provided by reversing his convictions and remanding for a new trial. For this reason, we need not address his first PRP argument.

He next argues he should have received a *Frank*'s[6] hearing because there were numerous inaccuracies in the certificate of probable cause. Because we are remanding for retrial, he will have the opportunity to make this request on remand.

He lastly argues the State committed outrageous governmental misconduct warranting dismissal and the trial court erroneously denied his CrR 8.3(b) motion. CrR 8.3 governs dismissal of criminal cases at various stages. Relevant here, a court may "dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." CrR 8.3(b).

---

[6] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

40

The State responds that Stanley cannot raise his CrR 8.3(b) claim postconviction

because his criminal prosecution has terminated. We agree.

"A criminal prosecution is no longer ongoing postjudgment and therefore is not

subject to dismissal under CrR 8.3(b)." *State v. Basra*, 10 Wn. App. 2d 279, 286, 448

P.3d 107 (2019), *review denied*, 194 Wn.2d 1020, 455 P.3d 133 (2020); *see also State v.*

*Pringle*, 83 Wn.2d 188, 190, 517 P.2d 192 (1973) (holding the "criminal prosecution"

terminated upon entry of a guilty plea and order of judgment and sentence).[7]

Stanley argues his CrR 8.3(b) motion is appropriate at this juncture. He cites

RCW 10.73.090(3)(b) to argue his judgment is not final until this court rules on his direct

appeal, which he has consolidated with his PRP. It is on these grounds that he argues his

"PRP is not post-conviction, because there is still an ongoing prosecution." Pet'r's Reply

to State's Response at 25. We disagree.

A PRP is a form of postconviction relief regardless of whether it has been

consolidated with a direct appeal. That Stanley is in the process of appealing his

---

[7] Stanley could have sought relief under CrR 7.8, which provides: "On motion and upon such terms as are just, a court may relieve a party from a final judgment, order, or proceeding for . . . misconduct of an adverse party . . . [or a]ny other reason justifying relief from the operation of the judgment." CrR 7.8(b)(3), (5). But he did not present an argument on these grounds.

conviction does not make his prosecution ongoing; his prosecution terminated upon entry of judgment below.

For the reasons noted, we reverse Stanley's convictions, remand for further proceedings consistent with this opinion, and dismiss Stanley's PRP.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____         _____
Pennell, C.J.                                                  Siddoway, J.